**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Earl Dean BOND, Alan Lowell Hampton, Sammie Lee Lewis, and Randy Lee Bond, Defendants-Appellants.**

Nos. 86–3012, 86–3015.

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1988.

Decided May 16, 1988.

Robert S. Bailey, Chicago, Ill., David Freeman, Federal Public Defender, St. Louis, Mo., Theodore Diaz, Law Office of Theodore Diaz, Alton, Ill., for defendants-appellants.

Robert T. Coleman, Asst. U.S. Atty., Frederick J. Hess, U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before HARLINGTON WOOD Jr., POSNER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Earl Dean Bond was a middleman between a supplier of marijuana in New Orleans and a distribution network in southern Illinois and Missouri. During part of the time involved in the charge, Bond purchased the drugs and resold them; later, when he became uncomfortably "hot", he took a commission, while Conrad Ingold, the supplier in New Orleans, sold directly

to the distributors. Earl Bond was convicted both of conspiracy and of participating in a continuing criminal enterprise, 21 U.S. C. § 848; Ingold pleaded guilty to several charges; several of the members of the distribution net pleaded guilty or were convicted, and three of those members (including Earl's brother Randy) have joined Earl in appealing.

### I

Earl Bond started selling marijuana in bulk no later than 1974. From 1981 to 1986 Bond bought large quantities of marijuana from Ingold and other sources, selling to Jerry Juenger and Fred Crook. In 1984 alone Bond sold between two and three tons of marijuana to Juenger. Crook paid for some of his marijuana with cocaine, which Bond distributed. To move this much marijuana from New Orleans to Illinois and Missouri, Bond ran some stash houses and employed assistants. His arrest on an unrelated charge in early 1985, however, raised his visibility; from then until a mass arrest of participants in May 1986, Juenger bought directly from Ingold. Bond received a commission on these sales and lent the aid of his friends. He was unloading a large shipment when arrested in May 1986.

The Continuing Criminal Enterprise (CCE) statute applies only to one who "acts in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management", § 848(d)(2)(A). It is convenient to refer to such persons as "kingpins", for the statute is directed at "the 'top brass' in the drug rings, not the lieutenants and footsoldiers." *Garrett v. United States*, 471 U.S. 773, 781, 105 S.Ct. 2407, 2413, 85 L.Ed.2d 764 (1985). Earl Bond was no footsoldier. He prefers lieutenant's insignia and denies having a higher rank. As he tells the tale, Ingold was the supplier and one kingpin; Juenger was the distributor and another kingpin; he was a mere go-between.

The jury heard evidence that at one time or another Earl Bond acted in concert with at least 20 people, and that he was a man-

ager rather than a subordinate. He had to do a good bit of organizing, supervising, and managing to move tons of marijuana northward over several years. He argues that this is not enough because (1) the evidence did not show a permanent directorial role with these 20; (2) the indictment did not name five persons whom he directed, and (3) the jury did not necessarily agree on the same five; (4) after January 1985, he was out of the direct line of control.

To take the last first: the indictment charged that the criminal enterprise continued between September 1984 and May 1986, so that a diminished role after January 1985 would not absolve Bond of liability. Until January 1985 he was in the thick of things, and as much a kingpin as Ingold—for we do not suppose Ingold grew the marijuana in the bayous; he was himself a middleman. Bond did not ask the judge to instruct the jury to draw a line at January 1985, to convict him only if persuaded of his guilt by earlier activities. Even after January 1985 Bond visited stash houses and issued orders, and he certainly played a coordinating role. The highest bosses may rule indirectly, in ways that leave fewer traces; thus indirect supervision can satisfy the statute. *United States v. Phillips*, 664 F.2d 971, 1034 (5th Cir. 1981). Bond stresses that after January 1985 he was not a hands-on manager; yet the statute deals with both management and coordination, recognizing that one need not be a day-to-day supervisor to play an important role in a criminal enterprise. Bond was a sort of market-maker in marijuana, which may be a very valuable form of coordination. Real estate brokers help coordinate the market in real estate, even though they do not purchase the property and are paid (as Bond was) by commission. They influence the price signals that affect many persons' lives. The statute reaches those who "coordinate" activities. The jury was entitled to conclude, on the basis of Bond's entire activities from September 1984 through May 1986, that he had a managerial or coordinating role in a substantial operation. See *United States v.*

*Mannino,* 635 F.2d 110, 116–17 (2d Cir. 1980), another CCE prosecution of a middleman. Cf. *United States v. Ambrose,* 740 F.2d 505 (7th Cir.1984) (successful CCE prosecution of corrupt police on an aiding-and-abetting theory).

The first three contentions all deal with the allegations and proof that Bond acted in concert with five others. To the extent Bond served as a coordinator (rather than a manager) between January 1985 and May 1986, the five-person requirement is obviously met. Juenger and Crook employed many more than five persons to handle the marijuana, and Bond coordinated their activities with Ingold's. Suppose, however, we take the more narrow focus, looking only at Bond's deeds. He does not deny working with or issuing orders to at least 20 participants in this criminal venture. He claims instead that these were casual laborers, that the indictment did not name them, and that the jury did not necessarily agree on which five he supervised.

 That the participants in this venture were casual labor is irrelevant. The statute speaks of acting in concert with five persons; it does not say the same five continuously or specify that any of the five must be `"important" to the syndicate. Now the statute aims at criminal organizations. A small time dope dealer who keeps to himself and has a single mule to smuggle the drug into the country is outside the statute's scope. The dealer's need to replace his aide (because of arrests or the difficulty of getting good help in the business) would not authorize a CCE prosecution on the theory that the small-timer had one servant in January, a second in February, a third in March, and so on. The organization would never be larger than two. The Ingold–Bond–Juenger–Crook network was not a two-bit show, however; it dealt with tons of marijuana yearly and did cocaine business on the side. This network continuously had more than five employees. The question is whether Bond acted in concert with five as manager or coordinator. It is on this question that the tenure of office of the staff is irrelevant. That Earl Bond barked orders to Rylands on Monday and Wilhelm on Tuesday, while tossing bales of marijuana to his brother Randy on Wednesday—and that the Wilhelms of the organization may have been here today and gone tomorrow—does not detract from the extent of his coordinating role.

 The indictment did not name Earl Bond's supervisees, but the prosecutor represents without contradiction that he followed an open-files discovery policy. Bond does not contend that he was surprised by any of the proof at trial. An indictment in the terms of the statute is sufficient, provided the defendant has adequate notice of the charges he must meet. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *United States v. Zavala,* 839 F.2d 523, 526 (9th Cir.1988). The indictment used in this case is no different from the one we sustained in *United States v. Jeffers,* 532 F.2d 1101, 1105–06, 1113 (7th Cir.1976), vacated in part on other grounds, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977). The omission of five (or more) names from the indictment made it harder for the jury to focus on which persons Earl Bond supervised, but Bond did not ask for an instruction telling the jury that it had to agree on five particular persons or for a special verdict listing the five it believed he coordinated, so this subject cannot now be a source of relief. We very much doubt that Bond would have been entitled to such an instruction had he asked, see *United States v. Markowski,* 772 F.2d 358, 364 (7th Cir. 1985). The jurors must find unanimously that there were five, but demanding agreement on which five could produce unjustified acquittals. Suppose the evidence shows that the accused supervised 20 persons. Half of the jurors believe that the defendant supervised $A$ through $J$ beyond a reasonable doubt, and $K$ through $T$ more likely than not; the other half of the jury finds beyond a reasonable doubt that the defendant supervised $K$ through $T$, and more likely than not supervised $A$ through $J$ to boot. If the jurors had to agree on which five persons, the defendant would be acquitted, even though everyone believed beyond a reasonable doubt that he super-

vised at least ten persons. The point of the CCE statute is to impose special punishment on those who organize or supervise a significant number of others; the identity of these others is irrelevant to any theory about why punishment should be enhanced.

■ Earl Bond's final argument is that he could not properly be convicted of both running a continuing criminal enterprise and of conspiring to distribute marijuana and cocaine, in violation of 21 U.S.C. § 846. The Supreme Court held in *Jeffers* that these statutes may not be the basis of cumulative punishment, and in *Garrett* that running a continuing criminal enterprise is not the "same offense" for purposes of the Double Jeopardy Clause as the three predicate felonies essential to the CCE conviction. Putting these two cases together, the prosecutor contends that the two statutes may be the basis of concurrent sentences.[1] Bond disagrees and asks us to vacate the sentences on the two conspiracy counts. This is not a matter of great moment to him; the sentences for the conspiracy convictions run concurrently with the CCE sentence (and at 14 years, with parole eligibility, are shorter than the CCE sentence of 25 years without parole eligibility), but we cannot avoid the contention by invoking the concurrent sentence doctrine, for the district judge imposed a special assessment of $50 on each count under 18 U.S.C. § 3013(a)(2)(A). See *Ray v. United States*, — U.S. —, 107 S.Ct. 2093, 95 L.Ed.2d 693 (1987).

■ Bond does not spell out his argument, but it must start from the holding of *Jeffers* that the § 846 conspiracy and § 848 CCE offense may not be the basis of cumulative punishment and proceed to the proposition that what may not be the basis of separate punishment is really different aspects of the same crime. This summons up cases such as *United States v. Gaddis*, 424 U.S. 544, 96 S.Ct. 1023, 47 L.Ed.2d 222 (1976), which hold that when Congress de-

signs alternative crimes, only one may be the basis of conviction. *Gaddis* and similar cases, however, rest on a conclusion that to commit one crime is to be incapable of committing the other. In *Gaddis* the crimes were robbing a bank and possessing the proceeds, see 18 U.S.C. § 2113; the Court concluded that a robber could not be convicted of possession, because the possession offense was designed to catch people who were not robbers but received the proceeds from the robbers. The point of *Jeffers*, by contrast, is that one can *both* conspire (agree to run a drug business) and run a continuing criminal enterprise (strike the agreement and succeed); the conspiracy, under *Jeffers*, is a lesser included offense—or so a plurality assumed, 432 U.S. at 149–50, 97 S.Ct. at 2215–16. The two statutes reach the same group of persons. It is not illogical to convict a person of both agreeing to do something (§ 846) and succeeding on a grand scale (§ 848).

Someone who both conspires and succeeds has no legitimate interest in hiding that fact from the records of the criminal justice system. All the concurrent sentence for the § 846 conspiracy does is record that the prosecutor proved an agreement. That information may have value later on—not in parole proceedings, for some kind of criminal plan is implied by § 848, on which there is in any event no parole, but in the event a collateral attack affects the validity of the CCE conviction. Since the § 848 offense is a criminal combination plus (substantial) success, a later proceeding might conclude that there is some flaw in the "success" component of the CCE conviction. In that event, the sentence under § 846 lawfully could become the basis of punishment. That would happen automatically if the § 846 sentences remain in force, served concurrently with the CCE sentence. It would require extra motion if the § 846 sentences had to be vacated now and resurrected at some

---

1. There is a separate question, which we need not address, whether a § 846 conspiracy may be one of the three predicate offenses required for a conviction under the CCE Act. We reserved this question in *Markowski*, 772 F.2d at 361 n. 1, and have not resolved it since. This case does not require its decision, because the jury was not allowed to use the § 846 conspiracies as predicate offenses. See *United States v. Fernandez*, 822 F.2d 382, 384–85 (3d Cir.1987); *United States v. Young*, 745 F.2d 733, 750 (2d Cir.1984), both permitting such use.

future time. See *United States v. Sperling*, 560 F.2d 1050, 1060 (2d Cir.1977).

The conclusion that concurrent sentences may be imposed under § 846 and § 848 has the support of *Jeffers*, where this happened. The defendant was tried twice, and independent convictions were recorded. The Court held that this is permissible, provided the cumulative punishment does not exceed the maximum under the CCE Act. This led *United States v. Valenzuela*, 596 F.2d 1361, 1364–65 (9th Cir.1979), to approve the sort of sentence employed in our case. *United States v. Dickey*, 736 F.2d 571, 596–97 (10th Cir.1984), implies approval of the same position. Other courts of appeals have reached the opposite conclusion, however, relying on *Ball v. United States*, 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985).[2] *Ball* holds that a court may not impose concurrent sentences under 18 U.S.C. § 922(h) and § 1202(a), one of which proscribes receiving a firearm and the other bans possessing the weapon. This was a pair much like the one involved in *Gaddis,* and the Court concluded that Congress did not mean to expose to multiple convictions those who receive (and so necessarily possess) weapons illegally. Even concurrent sentences, the Court believed, could have adverse collateral consequences. We have already explained, however, why § 846 and § 848 do not create identical offenses, so that the principle of *Gaddis* and *Ball* rules. The most one can say is that the § 846 conspiracy is a lesser included offense of the CCE offense. *Jeffers* treated the two as sufficiently distinct to support separate convictions (even to allow sequential trials), but not sufficiently distinct to support cumulative punishments. That holding—coupled with the conclusion in *Garrett* that the Double Jeopardy Clause does not of its own force bar separate convictions for the CCE offense and its predicate felonies—supports the conclusion that a court may impose concurrent sentences for a § 846 conspiracy and the CCE offense. There is no risk of collateral consequences—the unavailability of parole on the CCE conviction ensures that the multiplication of convictions does not count against the defendant at parole time.

All of this may seem beside the point, however, to the extent the sentences are cumulative. *Jeffers* held that Congress did not authorize cumulative punishments for § 846 conspiracies and § 848 CCE offenses, yet the special assessments of $50 per count in this case are cumulative. It may be that *Jeffers* does not speak to this subject, because Congress added the $50 assessment to the criminal code in 1984, 18 U.S.C. § 3013(a)(2)(A), after *Jeffers* was decided; the new legislation requires a charge of $50 per conviction without regard to the statutory maxima that otherwise apply. We need not pursue this point, however: *Jeffers* does not govern because the total punishment imposed by the district court is less than the maximum allowed by the CCE Act. The Court was concerned in *Jeffers* with the use of § 846 convictions to impose punishments for a single criminal enterprise greater than Congress had authorized under § 848; in *Jeffers* itself the district court had imposed the maximum fine authorized by § 848 on top of fines under § 846. The plurality concluded that the defendant was "entitled to have the fine imposed at the second trial reduced so that the two fines together do not exceed $100,000" (432 U.S. at 158, 97 S.Ct. at 2220), which was then the maximum under the CCE Act. The Justices were not concerned about how the permissible fine was apportioned between counts; they simply insisted that the statutory maximum be observed. Earl Bond received no fine under the CCE Act, and the $100 exaction imposed as special assessments on the two conspiracy convictions is only a drop in the bucket compared with the exaction that could have been levied under the CCE Act. *Dickey*, 736 F.2d at 596–97. That one is called a "fine" and the other a "special assessment" cannot be de-

---

2. See *United States v. Amen*, 831 F.2d 373, 383–84 (2d Cir.1987); *United States v. Porter*, 821 F.2d 968, 978 (4th Cir.1987); *United States v. Maull*, 806 F.2d 1340, 1346–47 (8th Cir.1986); *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir.1986); *United States v. Grayson*, 795 F.2d 278, 288 (3d Cir.1986); *United States v. Schuster*, 769 F.2d 337, 344 (6th Cir.1985).

terminative. Bond's sentence is not excessive.[3]

## II

■ Randy Bond, Earl's brother, was convicted of conspiring to distribute marijuana, in violation of 21 U.S.C. § 846. He contends that the district court abused its discretion in denying his motion for a severance. Randy does not contest the propriety of the joinder under Fed.R.Crim.P. 8(b) and could not plausibly do so. All of the defendants were charged with this conspiracy, and a joint trial of co-conspirators is presumptively appropriate. Randy contends only that he was a small fry, and that the jury would hold against him the graver crimes charged against Earl (and others) in the remaining counts of the indictment. This is a risk in any joint trial, but there is also a great benefit to the judicial system in such trials. See *United States v. Buljubasic*, 808 F.2d 1260, 1263 (7th Cir.1987). The district court is in the best position to consider the balance of benefits and risks; the court did so in this case and did not abuse its discretion in requiring Randy Bond to stand trial with the other defendants.

## III

Alan Lowell Hampton was convicted of conspiring to distribute marijuana, conspiring to distribute cocaine, and possessing more than 50 kilograms of marijuana with intent to distribute it. Hampton was one of Crook's associates and worked with Earl Bond but was not closely affiliated with either Ingold or Juenger. Crook pleaded guilty and testified for the prosecution. The district court permitted Hampton's lawyer to cross-examine Crook about the deal Crook had struck with the government but would not allow the cross-examination to explore every crime Crook had committed and might have been prosecuted for—a

seemingly endless number. Hampton contends that the limitation on the cross-examination violated the Confrontation Clause of the sixth amendment. See *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

■ Hampton surely had a constitutional right to show the jury that Crook was in deep water and had struck a bargain to save his own neck, a bargain that gave Crook a reason to testify falsely against Hampton. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed. 2d 104 (1972). But once the jury got the drift, the court did not have to let Hampton pore over the crimes Crook had committed. Any repetitious lines of inquiry may be curtailed. Fed.R.Evid. 403. The district court permitted Hampton to show that Crook faced staggeringly large penalties; he even permitted Hampton to add up on a blackboard the statutory maxima of the penalties Hampton believed Crook faced (and avoided). The court finally cut things off (and ordered the blackboard erased) when Hampton's counsel became increasingly inventive in suggesting crimes with which Crook could have been charged. It would have been a waste of time to trudge through these, crime by crime, and elicit over and again the concession that, "Yes, if that is a crime at all, the plea bargain got me off the hook for that too." No juror could have been under the impression that Crook was a model citizen or was testifying against Hampton out of a sense of civic duty. Hampton has not pointed to any significant fact that did not come to the jury's attention. The district court did not abuse its discretion in invoking Rule 403.

Hampton's remaining argument is that the district judge should have recused himself. Judge Beatty has sentenced Hampton three times: once in 1975 as a state judge; once in 1982 as a federal judge; and the third time in this case. The sentences

---

3. Even if the special assessment or concurrent jail term for Count III, the cocaine conspiracy, were defective, we would have to affirm the sentence under Count II, the marijuana conspiracy. The marijuana conspiracy began, according to the indictment, in 1981; the continuing criminal enterprise did not begin until September 1984. The marijuana conspiracy therefore lasted for three years before the CCE offense began, and that conspiracy could support separate punishment. (The cocaine conspiracy charged in Count III, by contrast, began and ended during the time covered by the CCE offense charged in Count I.)

have grown increasingly severe (twenty-eight months in 1975, nine years in 1982, and twelve years in 1986; the most recent offense was committed while Hampton was on parole from the 1982 sentence). When imposing sentence in 1982, Judge Beatty remarked that in retrospect he may have been too lenient in 1975, because he expected Hampton to reform, but that his record through 1982 showed no improvement. (There were other sentences, by other judges, in between.) Hampton filed a motion under 28 U.S.C. § 455(a), relying on Judge Beatty's knowledge of Hampton and asserting: "Counsel for Defendant is informed that Judge Beatty has previously announced that he would disqualify himself upon request from hearing any future cases of this Defendant." The motion did not say where the judge had "previously announced" this, and Judge Beatty did not remember making any such statement.[4] He denied the motion.

■■■■ The motion presented to Judge Beatty gave no reasons other than the judge's familiarity with the defendant and the supposed announcement. The announcement, if there was one, must have been based on the judge's familiarity with Hampton, so the two grounds collapse to one. And this ground is insufficient. A judge need not recuse himself because of knowledge of a party gained in a judicial capacity. *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966); *United States v. Reeves*, 782 F.2d 1323 (5th Cir.1986). A judge is supposed to base a sentence on knowledge about the defendant's past and prospects; that some of the knowledge has been gained at close range rather than by reading presentence reports does not show bias.

Hampton has filed a supplemental brief containing a letter that states a more sub-stantial ground. Hampton's letter to his lawyer, written in prison, states: "Judge Beatty knew my Grandparents Lowell and Marie Hampton and my Parents Lowell Leo and Margret Hampton. Judge Beatty had been my Parent's [sic] Attoney [sic] until an argument for what they felt was unethical behavior and had torelace [sic] him with a new attoney [sic]." This, if true, might give an objective observer pause about Judge Beatty's impartiality in presiding over Hampton's trial. Yet the letter does not meet the criteria of 28 U.S. C. § 144: it is not in the form of an affidavit, is late without a showing of good cause (§ 144 requires the affidavit of bias to be filed at least ten days before trial), and is not accompanied by a certificate of counsel (who must attest that the affidavit is filed in good faith). As an argument about appearances under 28 U.S.C. § 455(a), the letter is untimely. We held in *United States v. Balistrieri*, 779 F.2d 1191, 1204–05 (7th Cir.1985), that disqualification under § 455(a) is prospective only, so that a defendant who does not take the necessary steps before trial may not later ask for a rerun of all proceedings. See also *United States v. Murphy*, 768 F.2d 1518, 1540 (7th Cir.1985). We have never applied this time limit to a claim of *actual* bias under § 455(b), but the record in its current state does not permit an assessment of such a claim, if Hampton is making one.[5] None of Judge Beatty's rulings hints at actual bias; Hampton's appellate counsel concedes this. We therefore reject Hampton's contention, without prejudice to any further development of a claim of actual bias, in violation of § 455(b)(1), that may be appropriate under 28 U.S.C. § 2255. See *Aeby v. United States*, 409 F.2d 1 (5th Cir.1969) (employing this procedure); *United States v. Brown*, 539 F.2d 467 (5th Cir.1976) (actual bias may be a ground for collateral relief).

---

4. Counsel did not make the statement in the form of an affidavit under 28 U.S.C. § 144, so we need not consider what the effect of such an affidavit would have been. See generally *United States v. Balistrieri*, 779 F.2d 1191, 1199–1202 (7th Cir.1985).

5. The letter is not clear on the point. Hampton's letter says that Judge Beatty's "personal involvement with my family makes it impossible for him to be impartial.... It is impossible ... to keep personal bias from influencing any decision." This could be read as a claim of either appearance of impropriety or actual impropriety.

## IV

Sammie Lee Lewis, who was convicted of conspiring to distribute cocaine, is the final appellant. The testimony made Lewis out to be a sub-distributor of Fred Crook. Lewis has two complaints: (1) the court admitted evidence of a taped conversation between Crook and Mrs. Lewis, during which she made statements inculpating her husband; (2) the court admitted evidence seized at the time of Lewis's arrest.

Crook cooperated with the government for a while after his arrest in May 1986. During this time he called the Lewis home to inquire why Sammie Lee Lewis had not paid for six ounces of cocaine Crook had furnished. Mrs. Lewis answered the phone and explained that her husband could not pay because the money had been confiscated at an airport while being transported by his cousin. She added that "he had been wantin' me ... to tell you this you know so to keep you all in good standing ..." and that "[W]e got a lawyer workin' on ah tryin' to get it back and stuff." Mrs. Lewis later gave Crook a receipt showing that the money had indeed been confiscated. Crook testified that he had had this conversation with Mrs. Lewis, and the tape was played for the jury. The court permitted the contents of the tape to be used as evidence against Mr. Lewis.

■ Mr. Lewis made a hearsay objection to the tape recording. The court admitted the tape after finding—on the basis of the tape—that Mrs. Lewis was a conspirator; the tape therefore was admissible as a conspirator's statement in furtherance of the conspiracy. This was at the time a problematic way to proceed. But while the appeal was pending *Bourjailly v. United States*, — U.S. —, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), held that hearsay may pull itself up by its bootstraps. Under Fed.R.Evid. 1101(d)(1), the hearsay rule is inapplicable to proceedings dealing with the admissibility of evidence; the Court therefore concluded in *Bourjailly* that a statement may demonstrate that its declarant is a member of the conspiracy, making the statement admissible as substantive evidence against another member. Mrs. Lew-is's statement shows that she was a participant in this drug adventure.

■ Overtaken by events, Lewis's counsel contended at oral argument that the statement's admission violated the marital privilege. This was not the basis of the objection in the district court, so the point is waived. Fed.R.Evid. 103(a)(1). It is not, at all events, a good point. The privilege today has two components: the state may not compel one spouse to testify against the other, and the state may not use as evidence confidential communications between the spouses. *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed. 2d 186 (1980). The taped conversation between Crook and Mrs. Lewis implicates neither aspect of the privilege: Mrs. Lewis was not compelled to testify, and the tape did not contain a conversation between Mr. and Mrs. Lewis. Mr. Lewis has no privilege to keep out of evidence all damning statements by a partner in crime.

We reach the last issue: the propriety of the seizure of evidence from Mr. Lewis. His brief did not help much in assessing this question. The pertinent portion of the statement of facts in his brief starts: "The testimony in light most favorable to the Movant [is] as follows". This is hardly the light in which the evidence is taken now that the district court has resolved factual questions against Lewis. Moreover, although the district court held a hearing and made oral findings, Lewis failed to attach these to his brief—despite his lawyer's certificate vouching compliance with Circuit Rule 30(a), which requires their inclusion. The prosecutor did not furnish the findings either; indeed neither side's brief referred to them. We searched the record for findings, since we doubted that Judge Beatty would deny a motion to suppress evidence without explaining the basis of his decision. Circuit Rule 30 is designed to ensure that this court is aware of all findings and rulings bearing on the matters in dispute. We should not have to root about for conclusions central to the case.

The evidence, as Judge Beatty found it, showed that the police were called to a "motel [that] is notorious in the Bridge-

town community for being a, what we might call a hot pillow joint." The owner had noticed a commotion and sought assistance that evening. The police testified that they were "routinely called there because of fights, women knocking on the door and this type of activity." A police patrol found two women and Sammie Lewis in a car near the motel, and the officers assumed the women were prostitutes. They tried to find out whether the three were registered guests of the motel and asked Lewis for identification; they saw a hand-rolled cigarette, apparently marijuana, and Lewis interjected: "[T]hat's nothing, can you just give us a break on that, forget that."

The officers promptly forgot the cigarette, because they found drug paraphernalia and scales in the back seat of the car. Lewis said that he wanted to talk to the officers and headed toward a room of the motel, asking the officers not to arrest him for the marijuana. They followed Lewis into the room, where they found more drug paraphernalia in plain view. The officers then arrested Lewis and, on searching him, found plastic bags full of cocaine. Judge Beatty concluded that the officers were entitled to make a *Terry* stop and, having done so, properly were in a position to see the hand-rolled cigarette. He continued: "at that point, ... while that may not be probable cause for an arrest, it certainly elevates the degree to which they can question. Then, of course, the officer testified, and I find his testimony to be credible, that he followed Mr. Lewis into the room and then saw the drug paraphernalia sticking out from under the bed.... Once he lifts the bed spread, he sees a gun, then we have got probable cause."

We agree with Judge Beatty that by the time the officers arrested and searched Lewis, they possessed probable cause. They may well have had probable cause as soon as they saw the scales on the back seat of the car; and Lewis's statement asking for "a break" sealed his fate. Perhaps the officers were prepared to give him a break, but they had ample cause not to. The arrest was reasonable under the fourth amendment, the evidence properly admitted.

AFFIRMED.