**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Lazaro Modesto DELGADO,**
**Defendant–Appellant.**

No. 91–10288.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 12, 1992.

Decided Sept. 8, 1993.

Greg M. Kane and Fred Browne, Law Offices of Fred Browne, Los Angeles, CA, for defendant-appellant.

Thomas R. Green, Asst. U.S. Atty., Las Vegas, NV, for plaintiff-appellee.

Before: ALARCON, HALL and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

Modesto Delgado was convicted of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(c)(2), conspiracy to distribute cocaine, unlawful use of a communication facility, and distribution of cocaine. We reverse Delgado's conviction of engaging in a continuing criminal enterprise, but affirm the convictions on the other counts. The evidence was insufficient to establish that Delgado organized, supervised, or otherwise managed five or more people. The remaining convictions are unaffected. The critical issue on the reversed count is whether Delgado's customers, and their customers, count as persons whom Delgado managed.

### I. Facts.

The government arrested two cocaine dealers in Las Vegas, Raul Fernandez and Mario Fajardo, who eventually led Drug Enforcement Administration agents to appellant Delgado. Fernandez and Fajardo testified for the government, and the continuing criminal enterprise case was based on their testimony and recordings of their telephone conversations with Delgado. Delgado had sold cocaine several times in quantities of several kilograms to each of them.

Fernandez had entered the cocaine business in 1985, when he learned from Delgado at a social gathering that an old mutual friend of theirs was a cocaine dealer, and the potential profits of the trade were considerable. A few months later, Delgado made his first sale to Fernandez, by undercutting their old friend's price. Delgado sold Fernandez two kilograms on credit. Sales of cocaine on credit, to be paid for after the buyer resells it, are called "fronting." Once Fernandez began buying from Delgado, he dropped his previous supplier and used Delgado exclusively, although Fernandez was free to buy from other suppliers.

About two weeks later, Fernandez paid Delgado for the first two kilograms, and bought four more. This time, Fernandez came with an associate whom he knew Delgado would not approve of because of his violent reputation, so Fernandez left his associate outside. Fernandez then had about six regular customers who bought on credit by the ounce. Delgado did not know who Fernandez's customers were or control the terms of Fernandez's sales to them. A couple of weeks later, Fernandez bought two kilograms from Delgado, who introduced Renieri Martinez as his employee. Fernandez made payment for his previous purchase to an unnamed individual who was staying in a cabin at a hotel and working for Delgado. Fernandez's final purchase was four kilograms. Delgado's price had gone down each time, and Fernandez had saved his profits. On cross-examination, Fernandez was asked about the extent to which Delgado controlled Fernandez's business:

Q Now, with respect to your organization, did Mr. Delgado make any decisions with respect to who purchased cocaine from you?

A No, he only distributed to us.

Q All right. And so he did not select your customers?

A No, the customers, we selected them.

Q And did he decide whether and to what extent you would front cocaine to your customers?

A No, we distributed; he would only give us the front.

Q All right. Did he prevent you from buying cocaine anywhere, at whatever price you chose to do so?

A No, he would quote us a price, and if it was convenient, we would buy there; if not, we would buy elsewhere.

In December 1985, Fernandez decided to separate from the business. He brought Fajardo to a meeting with Delgado, paid the

last of his debt to Delgado, and suggested that from then on, Delgado do business with Fajardo. Delgado told Fernandez that although he and Fajardo were friends, Fajardo was "not sufficiently responsible ... in the sense that he would spend more than what the business would produce and not make timely payments." Delgado was also worried about Fajardo's financial responsibility because Fajardo associated with "Koko," a violent addict who stole from Fajardo. For this reason, Delgado agreed to sell to Fajardo only if Fernandez agreed to guarantee Fajardo's debts to Delgado for cocaine Delgado would front. Fernandez did agree, and also shared Fajardo's profits.

On one occasion Delgado used Kiki Matamoros to deliver some cocaine to Fajardo. Delgado said in a surreptitiously taped conversation with Fajardo that he on occasion had his wife take care of certain customers. In another surreptitiously taped conversation, Fajardo told Delgado he was buying cocaine from someone else for $14,000 or $14,500 per kilogram, and Delgado responded that he was paying $15,000 and $15,250 himself.

Fajardo said he expanded Fernandez's customer list, but he did not consider his customers part of his business organization. "The customers are customers, they don't receive any instruction. They buy, that's all. I have only two people working for me, but I instruct them.... The rest are customers, they buy or no buy, that's all." Delgado did not give Fajardo orders about how to run his business—he just supplied inventory. When asked about whether Delgado would make decisions about who Fajardo could sell to, Fajardo explained that Delgado "couldn't be able to order me anything, because he has a business, I had mine.... [H]is activity was to supply me, that's all." Delgado told Fajardo he thought it was unwise to use Koko, but did not try to impose his will. Fajardo made his own decisions about extending credit to his customers. When asked whether he was free to buy from other suppliers, Fajardo responded "Oh, absolutely. You can buy, I started with Raul Herrera, and later I change with him. And later I change with other people. That's normal." During his

dealings with Delgado, Fajardo met two people who worked for Delgado, Renieri Martinez and a person who delivered the four kilograms, and knew of one more, Kiki Matamoros.

## II. Management of Five People.

■ The statute defining the crime of "continuing criminal enterprise" requires, as one of its elements, that the defendant act "in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management." 21 U.S.C. § 848(c)(2)(A). Acting in concert is not enough for this statute—the "with respect to ..." modifier means that the defendant must occupy the requisite position of management with respect to the people with whom he or she acts in concert. *United States v. Jerome,* 942 F.2d 1328, 1331 (9th Cir.1991).

■ The trial judge instructed the jury that the government had to prove the management element, but Delgado argues that the evidence was insufficient to support the verdict. In considering a challenge to the sufficiency of the evidence underlying a conviction, we determine whether, after " 'reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Bishop,* 959 F.2d 820, 829 (9th Cir.1992) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). We review the critical jury instruction for plain error, because Delgado did not object to it. *United States v. Bustillo,* 789 F.2d 1364, 1367 (9th Cir.1986).

In *Jerome,* we reversed a continuing criminal enterprise conviction, which, to meet the five person element, had required that the jury count the people from whom the defendant had regularly purchased drugs. We held that some sort of "managerial responsibility" is required, not just a regular business relationship:

We read the statutory language "or any other position of management" to indicate that an "organizer" must exercise some sort of managerial responsibility; one does

not qualify if one simply sets up a system of supply.... Every legitimate retail store makes arrangements with its regular suppliers. In one sense it may be said to organize its supply, but does it organize its suppliers? Surely not in the sense of being the manager of its suppliers. To be an organizer within the sense of the statute more is required than simply being a steady customer.

*Id.* at 1331 (citations omitted); *see also United States v. Apodaca,* 843 F.2d 421, 426 (10th Cir.) (requiring showing that defendant has some managerial position with respect to five or more persons), *cert. denied,* 488 U.S. 932, 109 S.Ct. 325, 102 L.Ed.2d 342 (1988); *United States v. Jones,* 801 F.2d 304, 308 (8th Cir.1986) (five or more persons must fall under defendant's managerial authority). We held that since the jury might have counted the suppliers toward the five persons, it was plain error not to have instructed them that "they must unanimously agree as to the identity of the five people Jerome organized, managed, or supervised." *Jerome,* 942 F.2d at 1331.

Delgado concedes that there was sufficient evidence to count three individuals—Renieri Martinez, Kiki Matamoros, and an unnamed male drug courier who delivered drugs to Fajardo—as persons he organized. He argues that the evidence was insufficient to convict him of having managed his wife, and, more important, Fajardo, Fernandez and their customers.

■ As to Delgado's wife, the evidence that he acted in concert with her to sell drugs and organized or supervised her consisted of Delgado's tape-recorded statement to Fajardo that "I put my wife on occasions to care [to] two or three nice customers of mine, who are the ones that you trust them, follow me?" The statement occurred during a conversation in which Delgado communicated to Fajardo that he had sold his entire inventory of cocaine over the weekend. There was no evidence that Delgado could have been referring to any context other than drug transactions, and Fajardo testified that he understood it as such. A jury could infer from this evidence that Delgado had managed or supervised his wife in narcotics

transactions. Accordingly, the evidence is sufficient to support a finding that Delgado managed his wife in the narcotics business.

Thus, the evidence was sufficient, taking it in the light most favorable to the government, for the jury to treat Delgado as occupying a position of management with respect to Renieri Martinez, Kiki Matamoros, his wife, and the person who made a delivery to Fajardo. The government concedes that the evidence was insufficient to show that the person to whom money was delivered at a hotel and the person who delivered cocaine to Fajardo were different people. This only amounts to four people, and the statute requires five. The indictment named Fernandez and Fajardo and their customers as among the five or more persons, and the government's argument throughout the case has depended upon their inclusion. As in *Jerome,* no unanimity instruction regarding the five people was given or requested, so different jurors could count different people as among the five, and the jurors were allowed to count Fernandez and Fajardo and their customers toward the five persons managed by Delgado. Under *Jerome,* then, the conviction of continuing criminal enterprise can stand only if Fernandez, Fajardo, and their customers could properly be counted.

As to Fernandez and Fajardo's customers, there is no evidence to support a finding that Delgado occupied any kind of managerial role with respect to any of them. The government implicitly conceded as much, arguing to the jury that Delgado organized the customers "in this sense only": he organized Fernandez and Fajardo, who in turn organized the customers, and did so knowing about the middlemen's organizational activities. The jury was urged to count these persons on the theory that Delgado vicariously organized them because he conspired with Fernandez and Fajardo, who directly organized them.

■ On appeal, the government relies on *United States v. Apodaca,* 843 F.2d 421 (10th Cir.), *cert. denied,* 488 U.S. 932, 109 S.Ct. 325, 102 L.Ed.2d 342 (1988), to argue that the evidence was sufficient to show Delgado organized the customers because they were

lower-level dealers, not merely consumers, and they were fronted the drugs just as Fernandez and Fajardo were. *Apodaca* is distinguishable because in that case, there was testimony that the people at issue worked for Apodaca, he told others that they worked for him, and he offered to pay for legal counsel if any of them were arrested. *See* 843 F.2d at 424, 427. Delegation of management to an intermediate supervisor does not prevent lower-level subordinates from being counted in the continuing criminal enterprise statute. *Id.* at 426; *United States v. Patrick,* 965 F.2d 1390, 1397 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992).

■ Here, there was no evidence of such instructions, nor evidence of suggestions, offers, or other inducement conveyed from Delgado to the customers. The evidence showed that Delgado had nothing to do with Fernandez's and Fajardo's arrangements with their customers. The evidence showed that Delgado did not set the prices at which the customers' sales were made, and did not receive any of the markup when Fernandez and Fajardo raised their prices to the customers. The evidence showed Delgado had no dealings with the customers directly, and there was no evidence that he influenced, directed, organized, coordinated, or otherwise purposefully affected their drug-dealing activities indirectly. In sum, there was no evidence to support a finding that Delgado organized, supervised or otherwise managed any of the customers.

We assume without deciding that the government need not prove the name of each person among the five, so the unnamed delivery person could be counted. *Cf. United States v. Possick,* 849 F.2d 332, 337 (8th Cir.1988). But this still does not get Delgado's organization up to five unless Fernandez and Fajardo were "managed" by him.

In *United States v. Ray,* 731 F.2d 1361 (9th Cir.1984), we held that to be an "organizer" within the meaning of § 848(c)(2)(A), one need not "necessarily [be] able to control those whom he or she organizes." *Id.* at 1367. Our reasoning was that the words "organizer, supervisory position, or any other position of management" are widely used in the business community and among the general public, and the ordinary meaning of "organizer" does not "necessarily" connote control over those organized. *Id.*

■ Although under *Ray,* an organizer is not "necessarily" able to control the persons organized, the "managerial responsibility" required by *Jerome* involves more than simply doing business with them. For example, applying the ordinary business usage required by *Ray,* the project manager for a general contractor on a construction project organizes the efforts of the independent contractors to whom the work is subcontracted out, without controlling the details of their performance. He manages, even though, since they are independent contractors, he does not control. *See United States v. Cruz,* 785 F.2d 399, 407 (2d Cir.1986) (holding that a defendant may exercise managerial authority over independent contractors, as well as employees).

■ This case poses a problem similar to that in *Jerome,* except that the persons at issue are customers instead of suppliers. *Jerome* cannot be limited to cases where a customer is accused of managing his suppliers, because its ratio decidendi does not allow for a distinction. The evidence that Delgado managed his customers, Fernandez and later Fajardo, was insufficient to allow a jury to count them toward the five people needed for the continuing criminal enterprise statute. Delgado's specifications of how they were to contact him obviously had to do with hiding his own criminal business from the police, not managing the way they did business.

*Ray* establishes that we must construe the words of the statute as they are used in the business community and among the general public. *Jerome* establishes that we must require that the organizer "exercise some sort of managerial responsibility," because of the statutory phrase, "or any other position of management" modifying the word "organizer." The evidence was uncontradicted that Delgado sold cocaine to Fernandez and Fajardo but did not in any sense manage their conduct of their own criminal businesses. We must therefore conclude that Delgado did not "occup[y] a position of organizer, a super-

visory position, or any other position of management," 21 U.S.C. § 848(c)(2)(A), with respect to Fernandez and Fajardo. In ordinary business usage, selling to people does not make one an organizer of customers, even wholesale customers, any more than buying from them makes one an organizer of suppliers. *Cf. Jerome* at 1331.

■ We respectfully disagree with our concurring colleague's view that the continuing criminal enterprise statute "requires only that Delgado act in concert with his distributor and 'occup[y] a position of organizer' with respect to them." The statutory language requires that the defendant "occup[y] a position of organizer, a supervisory position, or any other position of management...." 21 U.S.C. § 828(c)(2)(A). *Jerome* reads the phrase "or any other position of management" to mean that "an 'organizer' must exercise some sort of managerial responsibility." 942 F.2d at 1331. Although the issue in *Jerome* was whether the retailer organized his suppliers, the ratio decidendi was broader than that. The syntax of the statute, "A, B, or any other C," implies that A must fall within the class C; that is, organizers are counted only if they exercise some sort of managerial responsibility. By analogy, a statute regulating fishing may state that licensed individuals may catch up to some specified limit of "bass, trout, or any other fresh water fish." The limits would apply to fresh water bass, such as black bass, but not to sea bass, because the clause "or any other fresh water fish" limits "bass" and "trout" to those in fresh water. Likewise, under the continuing criminal enterprise statute, it is not enough to be just a non-managerial organizer, as Jerome was. While control is not essential, under *Ray*, management is, under *Jerome*. Congress has other statutes, such as 21 U.S.C. § 841 for people who sell cocaine, and 21 U.S.C. § 846 for people who conspire with others to sell cocaine. The continuing criminal enterprise statute contains its own additional and unique requirements.

■ The government acknowledges that "In the traditional sense, this is a chain conspiracy where the government is alleging that the Defendant DELGADO, at the higher end of the distribution chain, is responsible for organizing the individuals at the lower end of the chain." Appellee's brief at 2. But the "chain" is a metaphor, not an argument. In a government agency, one may, by going up the "chain of command," assign responsibility for larger numbers of employees holding lower rank. But business, unlike government, is often not hierarchical. The metaphor of a "chain of distribution" does not fit well if the buyers and sellers are not connected by steel "links," but instead operate independently of each other, with each being free to deal with others. One cannot infer who is "higher" than whom from who sells to whom. A manufacturer or distributor may have enough market power and product differentiation to be able to control the conduct of its retailers. Perhaps General Motors has the power to manage the conduct of a local Chevrolet dealer. In contrast, some distributors may have to compete for sales to retailers and for shelf space by offering favorable prices, credit and other benefits. A manufacturer of generic aspirin probably has little power to control the business conduct of Woolworth's or Wal–Mart, even though it is "higher" in what the government calls the "chain of distribution." We cannot assume that the cocaine business is more like the former than the latter kind of industry. It is at least a commercial possibility that the most market power in the cocaine business is held by the street dealers who control what in a legitimate business would be called "shelf space." The CCE element of "occup[ying] a position of organizer, a supervisory position, or any other position of management," 21 U.S.C. § 848(c)(2)(A), must be proved, and cannot simply be presumed on the basis of who sells to whom.

This is not to say that Delgado's "higher" position in the "chain" is irrelevant. Depending on the conditions of supply and demand, a seller may have more market power than a buyer, which he can translate into control over the buyer's activities. But that is not necessarily so, and depends on the circumstances. In this instance, the government's own case showed that Delgado's customers could and did switch to him from another supplier when he offered a better

price, and later shifted to a competitor for the same reason. It also showed a decline in prices over time from Delgado to Fernandez and Fajardo, from $40,000 to as little as $13,000 per kilo. In these circumstances, Delgado's "higher" position in the "distribution chain" does not by itself suffice to show that he had any sort of managerial authority over Fernandez and Fajardo. The evidence did not establish anything more than an arm's length buyer-seller relationship between Delgado and his customers, Fernandez and later Fajardo. No "managerial responsibility" was demonstrated or implied by any evidence. *Cf. Apodaca,* 843 F.2d at 426 (mere buyer-seller relationship, without more, is insufficient to show managerial responsibility). The commercial relationship appears to have been about the same, except for its criminality, as that between wholesalers. Delgado extended credit to his customers, as many wholesalers do, but his customers could sell to whom they pleased, on whatever terms they chose, without any direction from him, so far as the evidence indicates. They were free to hire whom they chose, even against Delgado's advice, and they did not share their profits with him. His customers were also free to shop, bargain, and switch suppliers, and they did so. Except for the felonious nature of the trade, the analogy *Jerome* draws to the relationship between a retail store and its regular suppliers applies to this case as well, with the modification that this relationship was between wholesalers.

■ To show that Delgado held managerial authority, the government relies upon the credit granted to Fernandez and Fajardo, Delgado's requirement that Fernandez guarantee Fajardo's trade balances, and Delgado's specifications regarding beepers and surreptitiousness for meetings and deliveries. Extension of credit may be relevant to show managerial authority, *cf. Jones,* 801 F.2d at 308, *Apodaca,* 843 F.2d at 427, but does not necessarily demonstrate such authority. In some market conditions, a seller providing credit may have enough power to manage his buyer's conduct of his business, and credit conditions may be a means of exercising that power. But credit may also reflect the buyer's market power. It is in the buyer's inter-

est not to have to pay for his inventory until after he has sold it. A buyer may have enough market power to condition his purchases upon receiving the goods on credit, even though the seller would prefer cash on delivery to the delay and risk of "fronting" the inventory. Under Delgado's credit arrangement, he received no money from Fernandez and Fajardo until they had sold the cocaine and had their profit locked in. His requirement that Fernandez guarantee Fajardo's trade balances gave Delgado more security, though not enough to cover the entire Koko loss, as it turned out. Although he refused to continue selling to Fajardo after the Koko loss, Delgado began supplying him again two years later. Without other indicia of authority, we are unable to conclude that the extension of credit, called "fronting," suffices to show managerial responsibility.

The testimony of the government's witnesses, Fernandez and Fajardo, of their independence, was unrefuted. Their plain spoken assertion of autonomy, and denial that Delgado managed their business affairs in any way, together with the evidence regarding the specifics of their business, did not allow for an inference that Delgado managed them. There was no evidence that Fernandez and Fajardo considered Delgado their "boss," accepted his views on whom they should hire in their own businesses, or otherwise allowed him to direct their affairs in any way. There was no evidence that Delgado used violence or the threat of violence to make Fernandez or Fajardo do as he wished. The evidence was insufficient to show that Delgado occupied, with respect to Fernandez, Fajardo, or their customers, the "position of organizer, a supervisory position, or any other position of management."

We respectfully disagree with our concurring colleague's reading of the transcript. Delgado "took Fernandez into his own operation" only in the sense that he sold cocaine to him. We cannot find testimony showing that Delgado "insisted that Fernandez turn [his business] over to someone responsible." Fernandez testified that he, not Delgado, suggested Fajardo. Delgado thought Fajardo was *not* financially responsible, but

agreed to sell to him anyway, provided Fernandez guarantee the debts. Except for the criminality of the trade, this resembles a common arrangement when the owner of a furniture store retires and sells her business; she may have to guarantee her buyer's credit in order to induce the suppliers to continue to "front" the inventory.

Because the evidence was insufficient as a matter of law, we need not reach the issues our concurring colleague would find dispositive, whether the prosecutor's argument was legally incorrect and misleading, amounting to plain error, or whether the instructions were plainly erroneous.

### III. The Motion to Suppress.

The police observed people under surveillance place objects that looked like kilogram packages of cocaine into Delgado's car, and saw Delgado move the packages from the passenger compartment into the trunk. They then observed Delgado driving in typical counter-surveillance fashion, including extensive driving around at night with his headlights off, and saw him put another package into his trunk. After these observations, the police stopped Delgado, and in a peaceful encounter without guns drawn, had him get out of his car and sit on the curb, without being handcuffed. An officer asked if he could look in the trunk, Delgado told him he could, and the officer replied that Delgado was not required to give permission. Delgado responded "No, go ahead." The police found four kilograms of cocaine and $36,000 cash in the trunk, and arrested Delgado.

 Delgado argues that the district court erred in denying his motion to suppress. We review the denial of the motion to suppress de novo, except that the findings of fact are reviewed under the clearly erroneous standard. *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1282 (9th Cir.1992). We review for clear error the district court's finding that Delgado's consent was voluntary. *United States v. Preciado-Robles*, 964 F.2d 882, 885 (9th Cir.1992). No clear error is shown with regard to the factual findings.

 Delgado argues that the stop when he was pulled over amounted to an arrest, that it was without probable cause, and that his consent to the search of his trunk was the involuntary result of the illegal arrest. The police observations in this case amount to probable cause for arrest. *Cf. United States v. Hoyos*, 892 F.2d 1387, 1392 (9th Cir.1989), *cert. denied*, 498 U.S. 825, 111 S.Ct. 80, 112 L.Ed.2d 52 (1990); *United States v. Del Vizo*, 918 F.2d 821, 825–27 (9th Cir.1990). We therefore do not need to decide whether the stop amounted to an arrest. The finding of consent was not clearly erroneous.

The portion of the judgment convicting appellant of continuing criminal enterprise is REVERSED. The remainder of the judgment is AFFIRMED.

CYNTHIA HOLCOMB HALL, Circuit Justice, concurring:

Although I agree that Delgado's conviction of continuing criminal enterprise ("CCE") must be reversed, I disagree with the majority's analysis. In my view, the evidence is sufficient, though not overwhelming, to support a jury verdict that Delgado's drug distributing was part of "a continuing series of violations" of federal drug laws undertaken "in concert with five or more other persons with respect to whom [Delgado] occupies a position of organizer, a supervisory position, or any other position of management...." 21 U.S.C. § 848(c)(2) (1988). Nevertheless, because the government's closing argument was both improper and highly prejudicial and the district court failed to give a specific unanimity instruction, the conviction must be reversed.

I

Viewing the evidence and the inferences that a jury could reasonably draw therefrom in the light most favorable to the verdicts, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), I conclude there is sufficient evidence to support the jury's finding that Delgado was an "organizer" with respect to Fernandez and Fajardo, despite evidence to the contrary.

## A

The evidence showed that Delgado initiated Fernandez's involvement in drug dealing by introducing Fernandez to his partner Herrera, who recruited Fernandez to join their drug business. Although Herrera supplied Fernandez at first, after Delgado quit doing business with Herrera and established an independent source of supply, Delgado took Fernandez into his own operation and supplied him directly, undercutting Herrera's price. Delgado was Fernandez's sole supplier of drugs.

Delgado fronted the cocaine to Fernandez, who in turn fronted the cocaine to the dealers in his distribution network. Proceeds from the drug sales were passed back to Fernandez, who paid Delgado for prior purchases each time he purchased more cocaine. Through Fernandez, Delgado sold 12 kilograms of cocaine, worth approximately $360,000. Delgado and Fernandez kept in frequent contact, and Delgado gave Fernandez a new supply every two weeks. Delgado directed the terms of the sales transactions, including when and where they took place; he arranged the meetings and telephone communications between himself and Fernandez.

Although Delgado did not attempt to control Fernandez's management of his own business, he disapproved of employing drug addicts or violent persons, and Fernandez attempted to prevent Delgado from learning about an employee of whom he knew Delgado would disapprove. Delgado also requested that Fernandez hire Martinez, one of Delgado's employees, in the Las Vegas operation. About this time, Fernandez was getting out of the business, but his successor Fajardo hired Martinez as requested. These actions suggest Fernandez felt subject to Delgado's influence to some degree.

When Fernandez sought to withdraw from the cocaine business, Delgado insisted that Fernandez turn it over to someone responsible. Delgado knew Fajardo because Fajardo had previously worked for someone in Miami who supplied drugs to Delgado. When Fernandez sought to turn the Las Vegas operation over to Fajardo, Fernandez brought Fajardo to meet Delgado, obtained Delgado's approval, and was required to guarantee Fajardo's credit as a condition of maintaining the cocaine supply. Delgado's fronting enabled Fajardo to operate a distribution network; Fajardo testified that there was no way he could have conducted the Las Vegas operation without having the cocaine fronted. Through Fajardo, Delgado sold roughly nine kilograms of cocaine, for approximately $270,000. Like Fernandez, Fajardo employed persons of whom Delgado disapproved, and Fajardo also attempted to keep their activities out of Delgado's sight. In addition, Delgado was Fajardo's sole supplier until he terminated their relationship.

This evidence is sufficient to support a finding that Delgado "organized" Fernandez and Fajardo. He introduced both distributors into the Las Vegas operation. He extended credit to enable the distributors to go into the cocaine business. Delgado gave both Fernandez and Fajardo cocaine worth roughly $120,000 at a time, with no payment or security in return. A jury could reasonably assume that Delgado would not leave such valuable property on consignment with a person over whom he had no influence. Delgado set the price and terms of the transactions, controlled the quantity, and arranged the method of pick up and payment.

Delgado generated substantial sales from the Las Vegas operation and transacted frequently and regularly with both Fernandez and Fajardo. Delgado's operation was clearly the type of continuing criminal enterprise the statute intends to punish more heavily than the occasional drug trafficker. The fact that Delgado was less authoritative or dictatorial than the typical "kingpin" and did not control his distributors does not remove his business from the operation of the statute. *United States v. Ray*, 731 F.2d 1361 (9th Cir.1984); *United States v. Mannino*, 635 F.2d 110, 117 (2d Cir.1980). The law does not require that Delgado manage the distributors' day to day operations, or select their dealers, or set the price at which they sell the drugs, to be an organizer of a criminal enterprise. *United States v. Bond*, 847 F.2d 1233, 1236 (7th Cir.1988). A rational jury could find that Delgado "occupie[d] a position of organizer" with respect to Fernandez and

Fajardo by selecting them as his distributors and arranging the supply of drugs from Columbia, arranging the pick up of drugs by his distributors, arranging the timing, quantity, and price of drug sales, and fronting drugs to the distributors to enable them to go into business. This last fact, while perhaps not sufficient in itself to establish Delgado's organizational role, is important. *But cf. United States v. Cruz,* 785 F.2d 399, 407 (2d Cir.1986) (consignment of drugs for sale on commission is sufficient to establish organizational element for purposes of CCE statute). Of greater significance is the fact that Delgado set the terms under which Fernandez transferred the Las Vegas operation to Fajardo. While it could be viewed as nothing more than a condition of sale to an independent distributorship, it is evidence that could lead a rational jury to conclude that on some level Delgado controlled Fernandez's operation of the drug business.

Delgado argues strongly that Fernandez and Fajardo could not be counted as persons organized by him as a matter of law, relying on *United States v. Jerome,* 942 F.2d 1328 (9th Cir.1991). In *Jerome,* this Court questioned whether a drug dealer's suppliers were "subject to" the dealer as an organizer. Looking at the statutory language, we said that "an 'organizer' must exercise some sort of managerial responsibility; one does not qualify if one simply sets up a system of supply." *Jerome,* 942 F.2d at 1331. Delgado reads *Jerome* to mean that to "occupy a position of organizer" with respect to another person under the CCE statute, one must manage the persons purportedly organized. I disagree. Section 848 requires only that Delgado act in concert with his distributors and "occup[y] a position of organizer" with respect to them. 21 U.S.C. § 848(c)(2)(A) (1988). We have said that the statutory terms "position of organizer, a supervisory position, or any other position of management" carry their ordinary, everyday meanings. *Ray,* 731 F.2d at 1367. Ordinary usage of the term "organize" includes the following meanings: to arrange or form into a coherent unity or functioning whole; to set

up an administrative structure; to persuade to associate in an organization; to arrange by systematic planning and united effort. Webster's New Collegiate Dictionary 802 (1979). Thus, in common understanding the term "organizer" may simply imply an exercise of managerial responsibility over the enterprise or undertaking organized, rather than over the persons organized. Organizers can bring people together for a common purpose without exercising any degree of influence, control, or responsibility over those persons.

*Ray* recognized this, holding that the ordinary, common-sense meaning of "organize" does not carry the implication that the organizer is necessarily able to control those whom he organizes. 731 F.2d at 1367.[1] This is the prevailing view in other circuits as well.

> [W]hile proof of a supervisory or managerial relationship requires a showing of some degree of control by the defendant over the other persons, such proof is not required to show that a defendant acted as an organizer. An organizer can be defined as a person who puts together a number of people engaged in separate activities and arranges them in one essentially orderly operation or enterprise.

*United States v. Butler,* 885 F.2d 195, 201 (4th Cir.1989) (internal quotation omitted); *accord United States v. Patrick,* 965 F.2d at 1397; *United States v. Apodaca,* 843 F.2d at 426; *cf. United States v. Oberski,* 734 F.2d 1030, 1032 n. 3 (5th Cir.1984) (statute does not require actual control over others to be manager or organizer); *United States v. Bond,* 847 F.2d at 1236 (statute reaches those who "coordinate" activities).

Given the statutory language and our holding in *Ray, Jerome's* dicta that the statute does not apply to one who "simply sets up a system of supply" means only that something more than a bare buyer-seller relationship is required. *See Jerome,* 942 F.2d at 1331 (citing *Apodaca,* 843 F.2d at 426); *accord United States v. Patrick,* 965 F.2d at 1396; *Unit-*

---

1. Delgado's reliance on *United States v. Jones,* 801 F.2d 304, 308 (8th Cir.1986), which required

an element of control, is thus misplaced.

*ed States v. Butler,* 885 F.2d at 201.[2] A wide range of conduct may be sufficient to indicate the existence of more than a bare buyer-seller relationship, however, including: arranging acquisition and delivery, distributing drugs on consignment or credit, setting price and credit terms, arranging contacts and meetings, and transacting in large quantities with regularity. *See United States v. Moya–Gomez,* 860 F.2d 706, 748–49 (7th Cir.1988), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989); *United States v. Apodaca,* 843 F.2d at 426; *United States v. Grubbs,* 829 F.2d 18, 19 (8th Cir.1987) (per curiam); *United States v. Wilkinson,* 754 F.2d 1427, 1431–32 (2d Cir.), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *United States v. Dickey,* 736 F.2d 571, 588 (10th Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985); *United States v. Mannino,* 635 F.2d at 117. Here, there was evidence that Delgado did all of these things; he was not a simple salesman offering a product to occasional consumers.

Delgado asserts that the CCE statute requires a showing that he "exerted some type of influence over" Fernandez and Fajardo, as exemplified by "compliance with [Delgado's] directions, instructions, or terms." Appellant's Brief at 30–31 (quoting *United States v. Possick,* 849 F.2d 332, 336 (8th Cir.1988)). Even assuming he is correct, which is unclear in light of *Ray*'s holding that no showing of control is required, the argument avails him nothing. The evidence shows that Fernandez, at least, complied with Delgado's terms both in the manner in which he obtained the drugs and then transferred the operation to Fajardo.

The evidence was sufficient for a jury to find that in initiating and maintaining his wholesale supplier relationship with his distributor customers, Delgado occupied a sufficiently central role to be considered an organizer of a drug distribution enterprise within which Fernandez and Fajardo operated. Thus, in my view there was sufficient evidence to support a CCE conviction.

## II

However, I agree there is no evidence to support a finding that Delgado occupied any kind of organizational or managerial role with respect to any of Fernandez and Fajardo's customers. As the majority correctly points out, Delgado's CCE conviction in this case can stand only if Fernandez, Fajardo *and* their customers could properly be counted. *See ante* at 784. This results from two factors: the prosecutor's argument, and the lack of a specific unanimity instruction.

The prosecutor argued to the jury that in considering whether Delgado was guilty of continuing criminal enterprise, it could count the nine customers with respect to whom there was no evidence Delgado acted in an organizational or managerial capacity. The objectionable statements were neither brief nor incidental remarks. They comprised the whole of the government's argument on the element of Delgado's organizational, supervisorial, or managerial role—which was the sole element in dispute regarding the CCE charge. Moreover, they pertained to a substantial number of the persons the government held up as persons organized by Delgado—nine of the fifteen persons, whom the government could not otherwise connect to Delgado.[3]

Thus, this case presents circumstances similar to those in *Jerome:* the jury was "presented with a variety of persons that the

---

2. Despite its discussion of the type of relationship required by the CCE statute, *Jerome* held only that the district court erred in not giving a specific unanimity instruction. 942 F.2d at 1331. The original opinion in *Jerome* concluded that a properly instructed jury could have found that the defendant did, in fact, organize two of his suppliers. *United States v. Jerome,* 924 F.2d 170, 173 (9th Cir.1991), *amended,* 942 F.2d 1328, 1331 (9th Cir.1991).

3. Furthermore, the jury could easily have applied the government's erroneous theory to Fernandez and Fajardo as well as the customers. The evidence that Delgado organized Fernandez and Fajardo, even considered in the light most favorable to the government, was not overwhelming. The evidence of conspiracy, however, was. The prosecutor's arguments regarding Delgado's responsibility for Fernandez's and Fajardo's acts through the conspiracy may have encouraged the jury to convict Delgado of CCE *not* on the evidence of his organizational role, but on the basis of conspiracy principles.

prosecution told them could count in making up the five persons necessary to trigger the statute." 942 F.2d at 1331. The customers could not have been counted, however, because there was insufficient evidence to support the requisite finding that Delgado occupied an organizational position with respect to them. Under *Jerome*, the court therefore should have instructed the jury that the jurors "must unanimously agree as to the identity of each of the five people [the defendant] organized, managed or supervised." *Id.*[4]

The district court considered giving the proper specific unanimity instruction, but yielded to the government's objections to any instruction containing the word "identity." The government was apparently concerned that the jury would believe it could not count the unnamed male courier because the government had not proven his identity by name. Consequently, the court instructed the jury that it had to unanimously agree "as to the existence of at least five of the other persons" whom Delgado allegedly organized, supervised or managed. This only required the jury to unanimously agree there were at least five persons; it did not require the jury to unanimously agree as to the identities of each of those five, which is what *Jerome* required under these circumstances. Accordingly, *Jerome* instructs that we must reverse, and I concur in the judgment.[5]

**4.** The district court did not have the benefit of the amended opinion in *Jerome*, which was not filed until several months after Delgado's trial ended. The first *Jerome* opinion, however, would have advised the district court that "where the jury had a confusing array of persons presented, some of whom could be counted and some of whom could not be counted, it was plain error to fail to instruct the jury as to who could not count" towards a charge of continuing criminal enterprise. *United States v. Jerome*, 924 F.2d 170, 173, *amended*, 942 F.2d 1328, 1331 (9th Cir.1991).

**5.** A specific unanimity instruction would not have prevented the jury from unanimously agree-

ing to count some or all of the "uncountable" customers in reaching its verdict. The specific unanimity instruction might have prevented a reversal on the ground of jury confusion, however, as it would have enabled the district court upon post-trial motion, or this Court upon appellate review, to determine whether there was sufficient evidence to support the particular set of facts upon which the jury convicted. Special verdicts are not ordinarily used in criminal cases, and are only required under *Jerome* when a court permits facts which pose a genuine possibility of juror confusion to go to the jury. *Jerome*, 942 F.2d at 1331.