59 F.3d 177
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Carl Ernest WHITTENBURG, Defendant-Appellant.
 No. 94-10206.
 United States Court of Appeals, Ninth Circuit.
 Submitted June 12, 1995.*
Decided June 28, 1995.
 
 Before: SNEED, ALARCON, and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Carl Earnest Whittenburg appeals from the order resentencing him to life imprisonment for operating a continuing criminal enterprise under the United States Sentencing Guidelines ("guidelines") following remand by this court. Whittenburg contends that a second remand for resentencing is compelled because the district court violated the Ex Post Facto Clause of the United States Constitution by utilizing guidelines which became effective after his offense was completed. Whittenburg also alleges that the district court's upward departure was based upon erroneous factual conclusions and evidence obtained after his original sentencing on August 27, 1992. We affirm because the record shows that the district court applied the guidelines in effect on the date the crime was committed, its findings are not clearly erroneous, and it did not rely upon evidence obtained after Whittenburg's original sentencing.
 
 I.
 
 3
 Whittenburg was found guilty by a jury of various drug-related offenses, including the operation of a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. Sec. 848 (1988).[1] Whittenburg was sentenced on twenty-nine counts on August 27, 1992. On the CCE count, the district court departed upward from the sentencing guidelines range of 235-293 months to a total offense level 43, Criminal History Category I. The district court imposed a term of life imprisonment. On all other charges, the district court sentenced Whittenburg to shorter periods of custody to run concurrently with his sentence on the CCE count.
 
 
 4
 Whittenburg appealed from the judgment of conviction and the original sentence imposed by the district court. In the prior appeal, United States v. Whittenburg, No. 92-10535 (9th Cir. Dec. 22, 1993), we issued an unpublished memorandum decision in which we stated that the district court failed to explain adequately the reasons to support its decision to depart upward from the guidelines range of 235-293 months' imprisonment to a sentence of life imprisonment.[2] We affirmed the judgment that Whittenburg was guilty but remanded for resentencing on the CCE count. We directed the district court "to explain the extent of its departure."
 
 
 5
 On remand, the district court again departed upward and sentenced Whittenburg to life imprisonment on the CCE count. In the oral proceedings at resentencing, the district court provided a lengthy explanation for the basis and extent of its upward departure. This appeal followed.
 
 II.
 
 6
 A. Violation of Ex Post Facto Clause.
 
 
 7
 Whittenburg contends that the district court erred by basing its upward departure to life imprisonment for his CCE conviction on a version of the guidelines which went into effect after the date of that offense, thereby violating the Ex Post Facto Clause. A criminal statute violates the Ex Post Facto Clause if it is retroactive and disadvantages the offender. Miller v. Florida, 482 U.S. 423, 430 (1987); United States v. Guzman-Bruno, 27 F.3d 420, 422 (9th Cir.), cert. denied, 115 S. Ct. 451 (1994) (if a sentencing provision increases between the time the offense was committed and the time of sentencing, the court must apply the version of the guidelines in effect at time the crime was committed). We review de novo the question whether an application of the guidelines violates the Ex Post Facto Clause. United States v. Carson, 988 F.2d 80, 81 (9th Cir.), cert. denied, 114 S. Ct. 142 (1993).
 
 
 8
 At resentencing, the district court incorporated statements it made at the initial sentencing on August 27, 1992. Whittenburg claims that, at the initial sentencing, the district court erroneously relied upon guidelines which went into effect on November 1, 1989, even though Whittenburg's CCE offense was not concluded until September of 1989. Whittenburg provides no further explanation for his theory, but presumably reasons that the district court found an upward departure justified because the subsequent version of the guidelines applied a more stringent base offense level for quantities of cocaine, like those involved in this case, in excess of 1,500 kilograms. Specifically, the drug quantity table as amended November 1, 1989, provided that an offense involving 1,500 kilograms of cocaine or more corresponded to an offense level of 42. U.S.S.G. Sec. 2D1.1 (Nov. 1989). Prior to this amendment, the highest quantity of cocaine recognized on the drug quantity table was 50 kilograms, which corresponded to a base offense level of 36. U.S.S.G. Sec. 2D1.1 (Nov. 1987). In support of this argument, Whittenburg cites the following statement by the district court:
 
 
 9
 But I think that reference to the evolution of the guidelines that the Commission speaks to, as going to take place and that has taken place as we've all experienced over the last five years with the sentencing guidelines, and it is telling to focus on the changes that have occurred with regard to the treatment of continuing criminal enterprises under 2D1.5 and the application notes under the sentencing guidelines. And I took Mr. Angelo [the prosecutor] to be referring to that when he talked about the 50-kilogram ceiling at that particular time, October 15, 1988, versus changes which have taken place since. And the enormous amount of cocaine which was involved alone in one of the counts -- Count 8 I believe it was, the 1,100 kilograms which may not rise to the level of the 15,000 [sic] that is referred to by Mr. Gentile [defense attorney] in his argument but certainly far exceeds the 300 -- I'm sorry, the 50 that provide the ceiling.
 
 
 10
 Whittenburg's argument is without merit. The district court's passing reference to the evolution of the guidelines does not demonstrate that it relied upon a subsequently enacted provision. Rather, the district court repeatedly acknowledged its obligation to rely on the version of the guidelines in effect when Whittenburg completed his crime. At the initial sentencing, the district court specifically stated that it would be impermissible to shift to a new and harsher guidelines scheme that did not exist at the time the defendant committed the offense.[3] Similarly, at resentencing, the district court emphasized that it was relying on guidelines in effect at the time of Whittenburg's offense, rather than the November 1989 guidelines, as the basis for Whittenburg's sentence.[4] The record shows that the district court relied only upon the version of the guidelines in effect at the time of Whittenburg's CCE offense. Accordingly, the district court did not violate the Ex Post Facto Clause.
 
 
 11
 B. Responsibility for Importing Two Thousand Kilograms of Cocaine
 
 
 12
 Whittenburg claims that the district court erred in finding Whittenburg responsible for importing two thousand kilograms of cocaine. This finding is significant for two reasons. The district court reasoned that two thousand kilograms of cocaine was a quantity not adequately taken into consideration by the Sentencing Commission and, thus, an aggravating circumstance justifying upward departure from the guidelines range.[5] United States v. Chatlin, 51 F.3d 869, 872 (9th Cir. 1995) ("In imposing a sentence, a district court may depart from the guidelines when it finds aggravating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.") (citation omitted). In addition, the district court utilized the two thousand kilogram figure in its calculation of the appropriate extent of the upward departure.[6] We review for clear error factual findings relied upon by the district court as the basis for its upward departure. United States v. Lira-Barraza, 941 F.2d 745, 746-47 (9th Cir. 1991) (en banc).
 
 
 13
 There is ample support in the record for the district court's conclusion that Whittenburg was responsible for importing at least two thousand kilograms of cocaine. In mid-1985, Whittenburg participated in the first of approximately twenty-one flights to smuggle cocaine into the United States. In August or September of 1987, Whittenburg unloaded 1,100 kilograms of cocaine from an aircraft that Whittenburg had landed at the Hughes Terminal at McCarran Airport in Las Vegas. In March of 1988, Whittenburg flew from Mexico to the Chino Airport in Southern California with a load of 700 to 1,000 pounds, or over 300 kilograms, of cocaine. In December 1988, Whittenburg returned to the United States from the Philippines with plans to fly the plane in an operation to smuggle approximately 7,000 pounds of cocaine from Mexico.[7] These illustrations of Whittenburg's importation activities, while not exhaustive, clearly support the district court's conclusion that Whittenburg was responsible for at least two thousand kilograms of cocaine.
 
 
 14
 C. Management of an Extremely Large Number of People
 
 
 15
 Whittenburg also contends that there was no basis in the record to support the conclusion that Whittenburg managed the individuals identified by the district court. At resentencing, the district court found that the upward departure was warranted on the ground that the quantity of cocaine exceeded two thousand kilograms and because Whittenburg managed at least eleven people. See U.S.S.G. Sec. 2D1.5, comment (n. 2) (Oct. 1988) ("If as part of the enterprise ... the quantity of drugs substantially exceeds that required for level 36 in the drug quantity table or the number of persons managed by the defendant is extremely large, an upward departure may be warranted."). The district court found that:
 
 
 16
 ... Mr. Patrick Friel, Mr. George Conrad, Mr. Leon Buck Ennis, Mr. John Wynn, Mr. Doyle Nave, Mr. Errol Roberson, Mr. Mike Edmondson, Dan Mensinger, Robert Werly, Claudia Rae, and to a lesser extent Mrs. Whittenburg, all comprise individuals that were subject to the supervision, the leadership of, the administration by Mr. Whittenburg during the course of the continuing criminal enterprise.
 
 
 17
 We review the district court's factual findings which form the basis for upward departure for clear error. Lira-Barraza, 941 F.2d at 746-47.
 
 
 18
 In the context of a CCE offense, the terms "organizer," "supervisor" and "manager" are to be given their ordinary meaning within the business community and among the general public. See United States v. Delgado, 4 F.3d 780, 785 (9th Cir. 1993). Managerial responsibility does not necessarily connote control over those organized. See United States v. Ray, 731 F.2d 1361, 1367 (9th Cir. 1984). A CCE defendant may be an "organizer," "supervisor" or "manager" without being the single head of the enterprise; rather, a defendant may be convicted under 21 U.S.C. Sec. 848 even though he was also managed by others. See United States v. Baker, 10 F.3d 1374, 1409 (9th Cir. 1993), cert. denied, 115 S. Ct. 330 (1994) (if one meets all the statutory requirements of Section 848, he or she may be convicted of the CCE offense even though he or she was also managed by others). The record supports the district court's finding that Whittenburg exercised managerial control over each of these individuals.
 
 Patrick Friel
 
 19
 Whittenburg utilized Friel's business, Valley Plastering Company, as a front to lease airplane hangars at Chino Airport and McCarran Airport to conceal the planes Whittenburg utilized in the smuggling operations. In exchange, Whittenburg loaned Friel a total of $450,000 in cash to help Valley Plastering pay its expenses. Friel repayed Whittenburg by signing Valley Plastering paychecks for Whittenburg's son even though he did not work for the company. Friel also laundered Whittenburg's drug money by arranging for sums of cash to be exchanged for cashier's checks and/or business checks.
 
 George Conrad
 
 20
 In late August or early September 1987, Whittenburg hired and paid Conrad to help unload 1,100 kilograms of cocaine from the plane that Whittenburg landed at McCarran Airport. The same year, Conrad agreed to arrange for a nominee purchaser for Whittenburg's smuggling aircraft after Whittenburg came under law enforcement scrutiny. Conrad also laundered money for Whittenburg at Whittenburg's instruction by receiving a sum of cash and exchanging it for a "legitimate check" or a cashier's check. Finally, Conrad complied with Whittenburg's request to arrange for storage to conceal Whittenburg's classic vehicles in May of 1987 when the United States Customs Department was inquiring about Whittenburg's assets.
 
 Leon Buck Ennis
 
 21
 At Whittenburg's instruction, Ennis laundered Whittenburg's drug proceeds into Nashville Nevada, a nightclub.
 
 John Wynn
 
 22
 Whittenburg hired Wynn to serve as his "right-hand" ground crewman for the smuggling into Chino Airport in March of 1988. Wynn accompanied Whittenburg and Mike Edmondson to a hanger at the Chino Airport, where they filled the smuggling airplane with gas and removed the seats in preparation for Whittenburg's trip to Mexico. As Whittenburg returned, Wynn and Edmondson waited outside the hanger at Chino Airport with portable radios and instructions to call Whittenburg if they observed any suspicious activity. When Whittenburg landed, Wynn and Edmondson unloaded cocaine from the plane into a waiting van. During this Chino Airport operation, Wynn stayed in a hotel room which was obtained by Whittenburg. Wynn also assisted Whittenburg at various times by taking bundles of smaller denominations of bills directly from him and converting them into larger bills.
 
 Doyle Nave
 
 23
 In late August or early September 1987, Whittenburg hired and paid Doyle Nave to help unload 1,100 kilograms of cocaine from the plane that Whittenburg landed at McCarran Airport.
 
 Errol Roberson
 
 24
 In late August or early September of 1987, Whittenburg hired and paid Errol Roberson to fly a counter-surveillance cover for him while he smuggled 1,100 kilograms of cocaine into McCarran Airport. Whittenburg instructed Roberson to insure that he "wasn't being trailed" by law enforcement.
 
 Mike Edmondson
 
 25
 In preparation for the "Cinco de Mayo" smuggling venture, Whittenburg instructed pilot Edmondson to fly across the border either through Los Angeles or over Palm Springs. Later, when the plane crashed, Whittenburg arranged for Edmondson's return from Mexico to the United States.
 
 
 26
 Edmondson also participated in the Chino Airport smuggling venture organized by Whittenburg in late March 1988. Edmondson accompanied Whittenburg and John Wynn to a hanger at the Chino Airport, where they filled the airplane with gas and removed the seats. The next morning, Edmondson flew with Whittenburg to Midland, Texas. While Whittenburg proceeded to Mexico to obtain drugs, Edmondson took a commercial flight to the Ontario Airport and was met by Wynn. Edmondson and Wynn then proceeded to the Chino Airport, where they waited outside the hanger for Whittenburg with portable radios and instructions to call Whittenburg if they observed any suspicious activity. When Whittenburg landed, Edmondson and Wynn unloaded cocaine from the plane into a van. During this Chino Airport operation, Edmondson stayed in a hotel room which was obtained by Whittenburg.
 
 
 27
 Edmondson also participated in money laundering for Whittenburg by receiving checks from Whittenburg and attempting to deposit the checks in Edmondson's account.
 
 Dan Mensinger
 
 28
 In preparation for the "Cinco de Mayo" smuggling venture, Mensinger was instructed to take a commercial flight to Las Vegas and meet Whittenburg, who would supply extra aviation fuel. Once in Las Vegas, Whittenburg directed Mensinger to a truck containing the drums of aviation fuel, which Mensinger took from Las Vegas to Southern California.
 
 Robert Werly
 
 29
 Whittenburg employed Werly to provide security to prevent strangers from interfering with his drug importation activities at the hanger he leased at the Sky Harbor Airport. Whittenburg supplied Werly with a radio so that Werly could contact Whittenburg in the event of suspicious activity. Whittenburg also paid Werly five thousand dollars in cash for his security work from May 6-27, 1987.
 
 Claudia Rae a.k.a. Calamity Jane
 
 30
 Claudia Rae stored cocaine at her Thelma Street house for Whittenburg. In addition, at Whittenburg's request, Claudia Rae obtained the address of her friend, Frank Gwartney, in Anchorage, Alaska, so that Whittenburg could maintain his aircraft used for drug smuggling in a name and location which could not be traced to Whittenburg. Claudia Rae also laundered Whittenburg's drug money into the St. Thomas resort and Nashville Nevada, a nightclub owned by Calamity Jane.
 
 Martha Whittenburg
 
 31
 Martha Whittenburg laundered Whittenburg's drug money by investing it in an entity named Golden Valley Travel and in the fishing vessel Hale Koa. She also arranged for the use of a nominee bank account through her friend, Jackie Sue Greene, so that she and her husband could safely receive wire transfers without attracting the attention of the Internal Revenue Service.
 
 
 32
 Because the record contains sufficient evidence to support the district court's finding that Whittenburg managed at least eleven people, the district court did not err in concluding that an upward departure was warranted.
 
 
 33
 D. Consideration of Newly Obtained Evidence
 
 
 34
 Whittenburg's final contention is that the district court erred at resentencing because, as part of the basis to depart upwards from the guidelines, the court considered testimony of Harry Acor and John Wynn which was obtained after Whittenburg's initial sentencing on August 27, 1992. Whittenburg argues that the district court erroneously relied upon the September 18, 1992 testimony of Acor and the April 9, 1993 testimony of Wynn that was attached to the Government's memorandum in support of the motion for an upward departure at resentencing. We review challenges to the legality of a sentence de novo. United States v. Turner, 898 F.2d 705, 708 (9th Cir.), cert. denied, 495 U.S. 962 (1990).
 
 
 35
 Whittenburg's argument lacks merit. The district court expressly stated that it would consider only evidence available at the time of the August 27, 1992 sentencing:
 
 
 36
 Well, counsel, you've presented a great many arguments as to how this matter should be handled at this time. It includes a recapitulation by the government as to the bases for which an upward departure should be imposed. And in the process the government does, as Ms. Cartledge says, refer to events that have developed or factors, testimony, statements which have been developed since the original sentencing. It's an interesting issue as to whether or to what extent this Court can rely on those post-August 27, 1992 statements. And I want to make sure that the record is clear in that regard.
 
 
 37
 I tend to think that the Court could properly do that; I don't see a due process violation attended with it. However, to make certain that there is no confusion and no unfairness as a result of that interpretation to Mr. Whittenburg, I think it's more appropriate in this case to try to hold the line at the time at which the original sentencing occurred on August 27th, 1992.
 
 
 38
 (emphasis added).
 
 
 39
 Whittenburg, however, argues that the district court reversed itself by relying on the testimony of Acor and Wynn obtained after the initial sentencing on August 27, 1992. In support of his position, Whittenburg points to the following statement:
 
 
 40
 It in my judgment is far more than that, and I'm not putting my head in the sand and ignoring in a sense what has happened since August 27, 1992, but the testimony at trial -- and I do think for example the particular event which is eluded [sic] to in Count 8, the 1100 kilograms, while the jury may not have returned a specific finding as to the precise amount as to that count, the evidence at the time of trial certainly supported that amount, the 1100 kilograms.
 
 
 41
 (emphasis added).
 
 
 42
 A complete review of the transcript of the sentencing proceedings following remand reveals that the district court did not rely upon the testimony of Acor and Wynn in making its findings. The district court made reference to their testimony solely to indicate that this evidence was consistent with the district court's findings at the original sentencing proceeding.
 
 
 43
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for submission on the record and briefs and without oral argument. Fed. R. App. P. 34(a); Ninth Circuit Rule 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 21 U.S.C. Sec. 848 provides, in pertinent part, that:
 (c) "Continuing criminal enterprise" defined
 For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if --
 (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
 (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter --
 (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
 (B) from which such person obtains substantial income or resources.
 
 
 [2]
 In the prior decision, we erroneously stated that the guidelines range was 240-293 months
 
 
 [3]
 At the initial sentencing, the district court stated:
 "[T]here's no automatic requirement and it's not even permissible to automatically shift to some different set of rules, to some new guideline scheme that exists now that didn't exist at the pertinent time in this offense."
 
 
 [4]
 At the beginning of the resentencing hearing, the district court acknowledged that:
 "Nobody really disputes, and Ms. Cartledge points out in defendant's sentencing memorandum, that there should be not [sic] reference to the November 1989 sentencing manual and I had not understood that being the government's position. What is being used is the manual which was U.S. Sentencing Guidelines Manual in affect [sic] October 15, 1988. That's the sentencing manual which was used at the time of sentencing previously."
 Near the end of the proceedings, the district court reiterated:
 Under the sentencing guidelines applicable as of October 15, 1988, which are the pertinent guidelines and the guidelines to which this court deems appropriate ..."
 
 
 [5]
 The commentary to the October 15, 1988 version of the sentencing guidelines specifically recognized that a defendant's responsibility for a quantity of cocaine substantially in excess of 50 kilograms or his or her management of an extremely large number of persons were factors not taken into consideration by the Sentencing Commission and, thus, could be considered as aggravating circumstances justifying upward departure:
 If as part of the enterprise ... the quantity of drugs substantially exceeds that required for level 36 in the drug quantity table, or if the number of persons managed by the defendant is extremely large, an upward departure may be warranted.
 U.S.S.G. Sec.2D1.5, comment (n.2) (Oct. 1988)
 
 
 [6]
 The district court provided a reasoned mathematical explanation that the two thousand kilograms warranted an upward departure from the guidelines range of 235-294 months to life imprisonment. The district court explained that the applicable drug quantity table provides for higher offense levels in multiples of three. For example, an offense level of 32 corresponds to 5 to 14.9 kilograms of cocaine, and an offense level of 34 corresponds to 15 to 49.9 kilograms of cocaine. If the drug quantity table continued in multiples of three to accommodate the two thousand kilograms of cocaine at issue in Whittenburg's CCE offense, the base offense level would be 42 based upon a range of 1,363 to 4,089 kilograms of cocaine. This offense level of 42, with a two-point enhancement for obstruction of justice, results in an offense level of 44. Because the maximum offense level in the sentencing table is 43, which requires a sentence of life imprisonment for all criminal history categories, the district court sentenced Whittenburg to life imprisonment
 
 
 [7]
 Whittenburg argues that although he initially agreed to fly in the cocaine, he should not be held responsible for the 7,000 pounds of cocaine because the smuggling operation was abandoned. Whittenburg, however, was convicted by the jury for this attempted importation. Because the sentencing guidelines dictate that the offense level for attempted crime should be the same as if the crime had succeeded, U.S.S.G. Sec. 2D1.4, the district court properly considered the 7,000 pounds in support of its conclusion that Whittenburg was responsible for at least two thousand kilograms of cocaine