**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

January 31, 2024

Scott James Leonhardt, Esquire
The Rosner Law Group LLC
824 North Market Street, Suite 810
Wilmington, DE 19801

Laurence V. Cronin, Esquire
Smith, Katzenstein & Jenkins LLP
1000 West Street, Suite 1501
Wilmington, DE 19899

RE: *Jason Terrell v. Kiromic Biopharma, Inc.,*
Civil Action No. 2021-0248-MTZ

Dear Counsel:

This letter decision addresses whether language sounding in waiver extends to unexercised stock options. Plaintiff, Dr. Jason Terrell, argues he holds rights to unexercised stock options under certain agreements; defendant Kiromic Biopharma, Inc. (the "Company") argues Terrell waived those rights in a subsequent stock option grant notice. This letter assumes familiarity with the underlying dispute and previously defined terms; concludes the Company's committee lacked authority to interpret the grant notice; concludes Terrell waived rights to any unexercised options under that grant notice; and grants the Company's motion to dismiss.

## I.    BACKGROUND[1]

Terrell seeks a declaration that Agreements 1 and 2 remain valid and enforceable contracts[2] and seeks specific performance of those Agreements, including as to unexercised options.[3]   There is no dispute that Agreements 1 and 2 are valid and enforceable insofar as they granted Terrell options he then exercised on or before Agreement 3's execution date.[4]   The dispute concerns whether

---

[1] For the purposes of the pending motion, I draw the following facts from the plaintiff's Verified Complaint, as well as the documents attached and integral to it.  *See*, *e.g.*, *N. River Ins. v. Mine Safety Appliances*, 2013 WL 6713229, at *7 (Del. Ch. Dec. 20, 2013); *H-M Wexford v. Encorp*, 832 A.2d 129, 139 (Del. Ch. May 27, 2003).  Unless otherwise indicated, this opinion adopts the defined terms used in *Terrell v. Kiromic Biopharma, Inc.* (*Terrell I*), 2022 WL 175858 (Del. Ch. Jan. 20, 2022).  Citations in the form "Compl." refer to plaintiff's Verified Complaint, available at docket item ("D.I.") 1. Citations in the form "DOB" refer to Defendant's Opening Brief in Support of its Motion to Dismiss, available at D.I. 12.  Citations in the form "PAB" refer to Plaintiff's Answering Brief in Opposition to Defendant's Motion to Dismiss, available at D.I. 16. Citations in the form "DRB" refer to Defendant's Reply Brief in Further Support of its Motion to Dismiss, available at D.I. 18.

[2] Compl. ¶¶ 42–43, 52–53.

[3] *Id.* ¶¶ 43, 45, 47, 55, 57, 59.

[4] *See* DOB 16 ("If he exercised his options and received stock certificates, then the merger clause has no effect on those . . . .");  *see also* D.I. 28 at 8 (noting Terrell is still entitled to shares he received after exercising options granted by Agreements 1 and 2). Readers will recall the Grant Notice, the Incentive Plan, the Stock Option Agreement, and the Exercise Agreement "constitute the entire agreement" referred to as Agreement 3. D.I. 1, Ex. D at 2017 Stock Option Agreement [hereinafter "SOA"] § 15.2; *Terrell v. Kiromic Biopharma, Inc.* (*Terrell III*), 297 A.3d 610, 614 (Del. 2023).

language in Agreement 3's Grant Notice waived Terrell's rights to unexercised options granted by Agreements 1 and 2.

The relevant Grant Notice provision (the "Waiver") reads:

By signing this Grant Notice, you acknowledge and agree that other than the Shares, you have no other rights to any other options, equity awards or other securities of the Company (except securities of the Company, if any, issued to you on or prior to the date hereof, if any), notwithstanding any commitment or communication regarding options, equity awards or other securities of the Company made prior to the date hereof, whether written or oral, including any reference to the contrary that may be set forth in your offer letter, consultant agreement or other documentation with the Company or any of its predecessors.[5]

This letter is the most recent stop on a multijurisdictional tour. A dispute resolution provision in Agreement 3's Stock Option Agreement (the "SOA") required the parties to submit any dispute regarding "the interpretation of this Agreement" to a Company committee (the "Committee").[6] I concluded the Committee had to decide, in the first instance, (i) whether the dispute over the Grant Notice, a separate instrument from the SOA that was also part of Agreement

---

[5] D.I. 1, Ex. D at Notice of Stock Option Grant [hereinafter "Grant Notice"] at 2.

[6] *Terrell III*, 297 A.3d at 617, 619; SOA § 15.1.

3, fell within that provision, and (ii) if so, Terrell's dispute itself.[7]  The Committee

determined:

> i. the Committee has the exclusive authority, pursuant to Section 15.1
> of Dr. Jason Terrell's Stock Option Agreement with Kiromic
> BioPharma, Inc., to interpret Dr. Terrell's November 2017 "Notice of
> Stock Option Grant"; and
>
> ii. the merger clause in Dr. Terrell's grant notice supersedes and
> nullifies any option rights Dr. Terrell may have had under Dr.
> Terrell's prior agreements with Kiromic.[8]

I then dismissed the action for lack of subject matter jurisdiction.[9]

Terrell appealed, contending this Court "fail[ed] to review the Committee's

determination before dismissing his action for lack of subject matter jurisdiction,"

as this Court was "still required to subject the Committee's determination to some

form of judicial review."[10]  The Supreme Court of Delaware agreed, concluding

this Court was "not precluded by the terms of the parties' agreement from

reviewing the Committee's resolution of" (i) the scope of the Committee's

---

[7] *Terrell I*, 2022 WL 175858, at *7.

[8] D.I. 29 at Ltr.

[9] *Terrell v. Kiromic Biopharma, Inc.*, (*Terrell II*), 2022 WL 3083229 (Del. Ch. Aug. 2, 2022).

[10] *Terrell III*, 297 A.3d at 616.

authority, and (ii) its decision that language in the Grant Notice extinguished unexercised options granted by Agreement 3.[11]

The high court then considered the "standard by which the Court of Chancery should review the Committee's legal determinations."[12] Analogizing the Committee as an expert to an appraiser, *Terrell III* relied on *Adkins Limited Partnership v. O Street Management, LLC*.[13] *Adkins* explains that when an appraiser must interpret the meaning of a legal document before performing an appraisal, that interpretation is subject to judicial review in which the appraiser's interpretation, while "clothed with no presumption of correctness," warrants deference "as long as it is reasonable and does not exceed the appraiser's authority."[14] *Adkins* also explains that when the question of contract interpretation goes to the scope of the appraiser's authority, that question resembles the question

---

[11] *Id.* at 622–23.

[12] *Id.* at 621. The Supreme Court also held Agreement 3 "as interpreted by the Court of Chancery" was not unconscionable. *Id.* at 623–24.

[13] *Id.* at 622–23 (citing *Adkins Ltd. P'ship v. O St. Mgmt., LLC*, 56 A.3d 1159 (D.C. 2012)).

[14] *Adkins*, 56 A.3d at 1167 (first quoting *Marceron v. Chevy Chase Servs., Inc.*, 258 F.2d 155, 158 (D.C. Cir. 1958); then quoting *Doggett v. McLachlen Bancshares Corp.*, 663 A.2d 511, 516 (D.C. 1995)). *Terrell III* also analogized contractually created expert committees charged with legal questions to statutorily created quasi-judicial administrative courts, the decisions of which federal courts review de novo. *Terrell III*, 297 A.3d at 623 n.49.

of substantive arbitrability, and the trial court will review that determination de novo.[15] *Terrell III* also discussed *AIU Insurance Company v. Lexes*, which similarly explains that the scope of an appraiser's authority is a legal question for the courts.[16] *Terrell III* concluded "the Committee's contractual interpretation was subject, under the [*Adkins*] court's reasoning, to *de novo* review," and this Court should have decided the Company's motion to dismiss "in light of its *de novo* interpretation of the relevant agreements."[17]

The Supreme Court remanded the matter for this Court to interpret the relevant agreements "consistent with [its] opinion."[18] The parties submitted post-remand letters on August 8 and August 18, which I took under advisement on September 4.[19]

---

[15] *Adkins*, 56 A.3d at 1167.

[16] *Terrell III*, 297 A.3d at 622 (citing *AIU Ins. Co. v. Lexes*, 815 A.2d 312, 314 (Del. 2003)); *AIU Ins. Co.*, 815 A.2d at 314 (noting "[t]he issue is whether the appraisers have the authority to include in their valuation items that are expressly excluded from coverage or items that exceed the coverage limits," and concluding that the trial court had jurisdiction to issue a "declaration of the scope of the appraisal process").

[17] *Terrell III*, 297 A.3d at 623.

[18] *Id.*

[19] D.I. 37 [hereinafter "Def. Letter"]; D.I. 38 [hereinafter "Pl. Letter"]; D.I. 39.

## II.    ANALYSIS

On the Company's Rule 12(b)(6) motion to dismiss, I must consider the facts as stated in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff.  "[T]he Court can resolve contract interpretation on a motion to dismiss."[20]   In doing so, "I give priority to the intention of the parties," and I "start by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language."[21]  "When the contract is clear and unambiguous, [I] will give effect to the plain-meaning of the contract's terms and provisions"[22] with the aid of interpretive canons.[23]   I must "lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory."[24]

---

[20] *Light Years Ahead v. Valve Acq.*, 2021 WL 6068215, at *5 (Del. Super. Dec. 22, 2021).

[21] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).

[22] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[23] *Bouchard v. Braidy Indus.*, 2020 WL 2036601, at *9 (Del. Ch. Apr. 28, 2020) ("[T]he court evaluates the relevant provision's semantics, syntax, and context, aided by interpretive canons.").

[24] *Osborn*, 991 A.2d at 1159 ("We will read a contract as a whole, and we will give each provision and term effect, so as not to render any part of the contract mere surplusage. We will not read a contract to render a provision or term 'meaningless or illusory.'"); *see* Antonin Scalia & Bryan A. Garner, *Reading Law:  The Interpretation of Legal Texts* [hereinafter "*Reading Law*"] 174 (2012) (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 58 (1868)).

### A. The Parties Did Not Send Disputes Regarding The Grant Notice To The Committee.

My mandate on remand is de novo review "under the [*Adkins*] court's reasoning."[25] Under *Adkins*, review of the Committee's scope of authority is de novo.[26] A de novo review of the Committee's scope of authority leads to the conclusion that the Committee did not have authority to resolve a dispute regarding the interpretation of the Grant Notice.

Section 15.1 of the SOA reads: "Interpretation. Any dispute regarding the interpretation of this Agreement shall be submitted by Optionee or the Company to the Committee for review. The resolution of such a dispute by the Committee shall be final and binding on the Company and Optionee."[27] The SOA defines "Agreement" to mean the SOA itself:

> This Stock Option Agreement (this 'Agreement') is made and entered into as of the date of grant (the 'Date of Grant') set forth on the Notice of Stock Option Grant attached as the facing page to this Agreement (the 'Grant Notice') by and between Kiromic, Inc., a Delaware corporation (the 'Company'), and the optionee named on the Grant Notice ('Optionee').[28]

---

[25] *Terrell III*, 297 A.3d at 623.

[26] *Adkins*, 56 A.3d at 1167.

[27] SOA § 15.1.

[28] *Id.* at 1.

This language plainly creates a distinction between the Grant Notice on the one hand and the SOA on the other, and limits Section 15.1 to the SOA.

It is true that the Grant Notice incorporates the SOA by reference, and the SOA incorporates the Grant Notice.[29]  "[A] contract may incorporate by reference provisions contained in some other instrument."[30]  "When an executed contract refers to another instrument and makes the conditions of the other instrument a part of it, the two will be interpreted together as the agreement of the parties."[31]  But interpreting agreements together is a different matter than setting aside the plain definition provided in one of those agreements.  Indeed, a holistic review of the instruments in Agreement 3 indicates they explicitly rely on each other for content

---

[29] *Id.* § 15.2 ("Entire Agreement.  The [Incentive] Plan, the Grant Notice and the Exercise Agreement are each incorporated herein by reference.  This Agreement, the Grant Notice, the [Incentive] Plan and the Exercise Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all prior undertakings and agreements with respect to such subject matter."); Grant Notice at 1 ("By their signatures below, [Terrell] and the Company agree that this Option is granted under and governed by this [Grant Notice] and by the provisions of the [Incentive] Plan and the Stock Option Agreement.  The [Incentive] Plan and the Stock Option Agreement are incorporated herein by reference.").

[30] *Duff v. Innovative Discovery LLC*, 2012 WL 6096586, at *12 n.72 (Del. Ch. Dec. 7, 2012) (quoting *State ex rel. Hirst v. Black*, 83 A.2d 678, 681 (Del. Super. 1951)).

[31] *Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 231 A.2d 450, 456 (Del. Ch. 1967), *aff'd*, 239 A.2d 629 (Del. 1968).

when that is what the drafters intended.[32]  The SOA's drafters plainly limited

Section 15.1 to the SOA itself.  That section did not send Grant Notice

interpretation disputes to the Committee.

That leaves the dispute over the Grant Notice for this Court.

### B.    The Grant Notice Contains An Express Waiver.

The parties agree that the disputed Grant Notice interpretation is "a simple

question of contract interpretation": whether Agreement 3's Grant Notice

preserved Terrell's unexercised options granted by Agreements 1 and 2.[33]  I begin

by observing that the Waiver is, in fact, a waiver.  This Court has long found clear

and unequivocal waivers to be binding on the waiving party.[34]  "A waiver is 'the

---

[32] *E.g.*, SOA § 15.1 (referring to the "Committee," which is only defined in the Incentive Plan at Section 14); Grant Notice at 1 (stating that the Grant Notice is "subject to the conditions, described below and in the Stock Option Agreement attached hereto as Exhibit A, including its annexes").

[33] Pl. Letter at 1; *see* Def. Letter at 2.

[34] *Realty Growth Inv. v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982) (discussing the requirements and effect of a waiver but finding no basis for attributing waiver beyond the construction of the fourth building that occurred); *see* 13 Richard A. Lord, *Williston on Contracts* [hereinafter "*Williston on Contracts*"] § 39:15 (4th ed. 2023) ("A party who has intentionally relinquished the right to performance by the other party may not thereafter seek judicial enforcement of the contract with regard to the waived performance and loses any right to damages for the failure to perform.  In short, once it has been established that a right has been waived, the party possessing the right prior to the waiver is generally precluded from asserting it in a court of law . . . .").

voluntary and intentional relinquishment of a known right.'"[35] "Three elements must be satisfied before a conclusion of waiver may be reached: (i) there is a requirement or condition to be waived, (ii) the waiving party must know of the requirement or condition, and (iii) the waiving party must intend to waive that requirement or condition."[36] A waiver "of a contract provision may be made by a party's express declaration, or it may be implied by representations that fall short of an express declaration of waiver."[37] An express waiver occurs when a party makes an unequivocal representation in words to disclaim certain rights.[38] Delaware courts use contract principles of interpretation to determine whether a written representation is "unequivocal and clear."[39]

---

[35] *Realty Growth Inv.*, 453 A.2d at 456.

[36] *Specialty Dx Hldgs. v. Lab'y Corp. of Am. Hldgs.*, 2021 WL 6327369, at *9 (Del. Ch. Dec. 16, 2021).

[37] 13 *Williston on Contracts* § 39:27; *see Specialty Dx Hldgs.*, 2021 WL 6327369, at *9 ("A waiver may [be] express or implied, but either way, it must be unequivocal.").

[38] *Vila v. BVWebTies LLC*, 2010 WL 3866098, at *10 n.72 (Del. Ch. Oct. 1, 2010) ("[A] party may waive—by words or conduct—any contractual right or obligation") (summarizing 13 *Williston on Contracts* § 39:14); *see* 13 *Williston on Contracts* § 39:14 ("[A] finding of waiver must be based on an intention expressed in explicit language to forego a right or on conduct under the circumstances justifying an inference of a relinquishment of it.").

[39] *Bouchard*, 2020 WL 2036601, at *9, 10 (invoking Delaware's objective theory of contracts, and looking to semantics, syntax and context, aided by interpretive canons, including the whole-text canon, to determine whether a contractual provision amounted to a jurisdictional waiver and holding that on its face, the language fell "short of

On its face, the Waiver unequivocally relinquishes Terrell's "rights to any

other options, equity awards or other securities of the Company."[40]  The Waiver

begins:  "By signing this Grant Notice, you acknowledge and agree that other than

the Shares, you have no other rights to any other options, equity awards or other

---

unequivocally relinquishing the right to contest a Delaware court's personal jurisdiction").

[40] Grant Notice at 2.  Terrell argues that the Grant Notice could not operate as a waiver of his unexercised options because "Agreement 3 . . . confer[red] no new consideration to Dr. Terrell, and, thus, would not constitute a binding contract in the first place."  PAB 10.  A waiver is a "voluntary . . . relinquishment of a known right."  *Realty Growth Inv.*, 453 A.2d at 456.  It does not require support by consideration.  13 *Williston on Contracts* § 39:14; *see*, *e.g.*, *In re Coinmint, LLC*, 261 A.3d 867, 893 (Del. Ch. Apr. 15, 2021) (reciting the standard for showing waiver, with consideration notably absent).

Terrell also argues that he could not have agreed to a relinquishment of his rights because such a waiver is unreasonable insofar as "no reasonable person would have accepted" it and it "is commercially unreasonable."  PAB 8.  This argument is an unconscionability argument.  *See Ketler v. PFPA, LLC*, 132 A.3d 746, 748 (Del. 2016) ("[A]n unconscionable contract is one which no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept, on the other." (internal quotation marks omitted)); *Rummel Klepper & Kahl v. Del. River & Bay Auth.*, 2022 WL 29831, at *14 (Del. Ch. Jan. 3, 2022) ("The 'business-practices-of-the-community' test is a means of evaluating substantive unconscionability." (citing *Tulowitzki v. Atl. Richfield Co.*, 396 A.2d 956, 960 (Del. 1978) (explaining unconscionability can be shown by the "business-practices-of-the-community test [that] asks whether the terms are so extreme as to appear unconscionable according to the mores and business practices of the time and place"))).  The Supreme Court of Delaware rejected Terrell's argument that Argument 3 was unconscionable.  *Terrell III*, 297 A.3d at 624.  I will not belabor the matter.  Neither Terrell's consideration nor unreasonableness argument disrupts the efficacy of the Waiver.

securities of the Company . . . ."[41]   The waived rights are expressly and expansively identified as "options," with reiterative phrases making clear that Terrell has "no other rights" or "any other options."

And the Waiver goes further, expressly emphasizing Terrell's renunciation of his reliance on prior Company commitments.  He relinquished his

> rights to any other options . . . *notwithstanding* any commitment or communication regarding options, equity awards or other securities of the Company made prior to the date hereof, whether written or oral, including any reference to the contrary that may be set forth in [his] offer letter, consultant agreement or other documentation with the Company or any of its predecessors.[42]

The term "notwithstanding" indicates the parties' intention "to supersede all other [agreements]."[43]

The Grant Notice contains an express waiver.  "A clearer statement is difficult to imagine."[44]

---

[41] Grant Notice at 2.

[42] *Id.* (emphasis added).

[43] *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993); *see Reading Law* 126–27 ("A dependent phrase that begins with notwithstanding indicates that the main clause that it introduces or follows derogates from the provision to which it refers.").

[44] *Cisneros*, 508 U.S. at 18 (internal quotation marks omitted).

### C. The Waiver Carveout Does Not Preserve Unexercised Options.

The parties' dispute centers on the meaning of that waiver and the carveout within it. Terrell agreed he has "no other rights to any other options, equity awards or other securities of the Company (*except securities of the Company, if any, issued to [him] on or prior to the date hereof, if any*)" (the "Carveout").[45] Terrell claims the Carveout expressly preserves "[options] of the Company . . . issued to [him]" because an option is a security.[46] The Company contends an unexercised option is not an "issued security."[47] I conclude, under Agreement 3's language, that while an option is a security, it is not an issued security.

An "option" is a type of "security" under the Grant Notice and the rest of Agreement 3. The Waiver's text makes this plain. Its phrase "no other rights to any other options, equity awards or other securities of the Company" categorizes options and equity awards as subsets of securities.[48] Generally, the conjunction

---

[45] Grant Notice at 2 (emphasis added).

[46] PAB 7.

[47] *See* DOB 11.

[48] Grant Notice at 2.

"or" "is . . . used to indicate an alternative."[49] And the use of the word "other" before a catchall phrase warrants application of the "reverse *ejusdem generis*" principle, under which the catchall helps define the specific examples.[50] Under that principle, the "grammatical context"[51] and syntax of the phrase "A, B, or other C" supports the conclusion "that A must fall within the class C."[52] In the Grant Notice, the general phrase "or other securities" defines the class of the preceding listed items. It follows that while a "security" is not necessarily an "option," an "option" must be a type of security.

---

[49] 13 *Williston on Contracts* § 30:12.

[50] *See Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 255 F.Supp.3d 443, 460 (S.D. N.Y. Apr. 28, 2015) (explaining the proper use of reverse *ejusdem generis* and holding it did not apply because the list did not conclude with a "catch-all" phrase and some of the specific terms preceding the general one did not have a common attribute from which a kind or class could be identified); *Safe Food & Fertilizer v. E.P.A.*, 350 F.3d. 1263, 1269 (D.C. Cir. 2003) (applying reverse *ejusdem generis* to understand the operation of the phrase "or other discarded materials" and holding that the "listed materials are 'solid waste' only if they are also 'discarded,'" because "the phrase 'A, B, or any other C' indicates that A is a subset of C").

[51] *Bristol-Myers Squibb Co. v. U.S.*, 2000 WL 1860718, at \*358 (Fed. Cl. Dec. 18, 2000) ("[The] [p]laintiff argues that the three conditions are in a categorical series linked by the word 'otherwise,' and that the reverse of the interpretive maxim *ejusdem generis* supports this interpretation . . . . The court concludes that plaintiff's interpretation of the proviso is consonant with its plain meaning. The meaning of these three phrases in the proviso derives from grammatical context.").

[52] *U.S. v. Delgado*, 4 F.3d 780, 786 (9th Cir. 1993).

Concluding that an option is a type of security does not settle the Carveout's meaning.[53] The Carveout applies only to securities "issued to [Terrell] on or prior to the date hereof, if any."[54] The parties dispute whether unexercised options were "issued" before that date, or if the Carveout is limited to "issued" shares. The Waiver would be meaningless if the Carveout's "issued" securities included all of Terrell's options: Terrell's statement that he has "no other rights to any other options" would be swallowed by the Carveout.[55] If "by any reasonable construction, the two can be made to stand together," I must pursue that construction.[56]

And so, because identical words used in different parts of the same agreement are presumed to "bear the same meaning throughout," I look to other

---

[53] DRB 2 ("Terrell maintains that "options" must be treated as 'securities' . . . . This misses the mark: the question is not what the single word 'security' means . . . but rather what the complete phrase 'securities of the Company, if any, *issued* to you' means in Agreement 3 . . . .").

[54] Grant Notice at 2.

[55] *Id*.

[56] *Reading Law* 174 (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 58 (1868)).

uses of the verb "to issue" and its related nouns in Agreement 3.[57] Agreement 3

never uses the word "issued" in relation to options. Instead, every use of

"issued,"[58] "issuance,"[59] and "issuable"[60]—all thirty-five of them—relates to

---

[57] *Id.* at 170–73; *see JJS, Ltd. v. Steelpoint CP Hldgs.*, 2019 WL 5092896, at *1 (Del. Ch. Oct. 11, 2019) ("[A]bsent anything indicating a contrary intent, the same phrase should be given the same meaning when it is used in different places in the same contract.").

[58] *See*, *e.g.*, Grant Notice at 2 (preserving "securities of the Company . . . issued to you"); SOA § 10 (discussing conferral of stockholder rights "from and after the date that Shares are issued to Optionee"); Incentive Plan § 2.1 (discussing a forfeiture where "Shares previously issued under the [Incentive] Plan are reacquired by the Company"); *id.* (discussing the Company's reacquisition of "Shares previously issued").

[59] *See*, *e.g.*, SOA § 4.3(e) (requiring payment approved by the Committee that "constitutes legal consideration for the issuance of Shares"); *id.* § 4.4 ("Prior to the issuance of the Shares upon exercise of the Option, Optionee must pay . . . ."); *id.* § 4.5 (heading titled "Issuance of Shares"); *id.* § 5 ("The exercise of this Option and the issuance and transfer of Shares shall be subject to compliance by the Company and Optionee . . . ."); *id.* § 7.1(d) ("Optionee shall have provided the Company with written assurances . . . for the grant of the Option, the issuance of Shares thereunder . . . ."); *id.* § 9.7 (discussing termination of right of first refusal "other than a registration statement relating solely to the issuance of Common Stock pursuant to a business combination or an employee incentive or benefit plan"); D.I. 1, Ex. D [hereinafter "Exercise Agreement"] § 4 (indicating optionee's acceptance of the "terms and conditions of the issuance of the Purchased Shares"); Incentive Plan § 2.1 (discussing forfeiture or repurchase whereby "such shares shall be added to the number of shares then available for issuance under the Plan"); *id.* (discussing the event where the "number of Shares reserved and available for grant and issuance under the [Incentive] Plan is increased").

[60] *See*, *e.g.*, SOA § 4.4 (discussing "Shares issuable upon exercise"); *id.* § 4.5 (indicating the Company "shall issue the Shares issuable upon a valid exercise of this Option"); Incentive Plan § 11(b) ("[T]he exercise price and the number and nature of shares issuable upon exercise of any such option . . . will be adjusted appropriately.").

Shares, not options.[61] The definitions of "Shares" and "Exercise Price" both include the word "issuable;"[62] the definition of "Option" does not.[63] To describe the Company's delivery of an option to purchase shares, Agreement 3 only uses the word "grant."[64] The Grant Notice itself uses that word.[65] And Agreement 3

---

[61] DRB 6 ("[T]he term 'issued' is never used in Agreement 3 with respect to options, but only with respect to actual shares of stock.").

[62] *See*, *e.g.*, Incentive Plan § 14 ("Shares' means shares of the Company's Common Stock . . . reserved for issuance under this Plan."); *id.* ("Exercise Price' means the price per Share at which a holder of an Option may purchase Shares issuable upon exercise of the Option.").

[63] *Id.* ("Option' means an award of an option to purchase Shares pursuant to Section 4 of the [Incentive] Plan.").

[64] *See* Grant Notice at 1 ("The Optionee . . . has been granted an option . . . . Optionee and the Company agree that this Option is granted under and governed by this Notice of Stock Option Grant . . . . Optionee accepts the electronic delivery of any documents that the Company . . . may deliver in connection with this grant."); SOA at 1 ("This Stock Option Agreement . . . is made and entered into as of the date of grant . . . ."); *id.* § 1 ("The Company hereby grants to Optionee an option . . . to purchase up to the total number of shares . . . ."); *id.* § 7.1(d) (referencing "the grant of the Option, [and] the issuance of Shares"); Exercise Agreement § 8 (discussing the exercise price per share "at the time the option was granted by the Board"); Incentive Plan § 4 ("The Committee may grant Options"); *id.* § 4.1 (discussing "[e]ach option granted under this Plan"); *id.* § 4.2 ("The date of grant of an Option will be the date on which the Committee makes the determination to grant such Option . . . ."); *id.* § 4.4. ("The Exercise Price of an Option will be determined by the Committee when the Option is granted and shall not be less than the Fair Market Value . . . unless expressly determined in writing by the Committee on the Option's date of grant."); *id.* § 4.8 ("[T]he Exercise Price may not be reduced below the minimum . . . that would be permitted . . . for Options granted . . . ."); *id.* § 11.2 ("In the event the Company elects to grant a new Option . . . such a new Option . . . may be granted . . . ."); *id.* § 12.3 (discussing the board delegation's to a Committee for "the granting of stock options and other equity awards"); *id.* 13.1(b) ("[N]o Option . . . granted . . . shall be exercised prior to the time . . . .").

makes clear that options and shares are different: "[an] [o]ptionee shall not have any of the rights of a stockholder with respect to any Shares unless and until such Shares are issued to [the] [o]ptionee."[66] Based on Agreement 3's language describing the delivery of options as compared to shares, I conclude that shares are "issued" while options are "granted."

The Carveout preserves only securities that have been issued, not securities that have been granted. This was presumably intentional.[67] If the parties intended for the Carveout to include grants and not just issuances, they would have included the word "grant[ed]," as they did other times where "grant and issuance" were to be construed together.[68]

---

[65] Grant Notice at 1 ("The Optionee . . . has been granted an option (this 'Option') to purchase shares of Common Stock . . . ."); *id.* ("Optionee and the Company agree that this Option is granted under and governed by this Notice of Stock Option Grant . . . .").

[66] SOA § 10.

[67] *MALT Fam. Tr. v. 777 P'rs*, 2023 WL 7476966, at *7 (Del. Ch. 2023) (interpreting a contractual provision that only identified the plaintiff and concluding that the inclusion of the plaintiff indicated the intentional exclusion of the defendant under the interpretative maxim *expressio unius est exclusio alterius*).

[68] Incentive Plan § 2.1 ("Subject to Sections 2.2 and 11 hereof, the total number of Shares reserved and available for grant and issuance pursuant to this Plan will be Twenty Million (20,000,000) Shares."); *id.* ("Shares subject to Awards that are . . . used to pay . . . the exercise price of an Option or that expire by their terms at any time will again be available for grant and issuance in connection with other Awards.").

Because the Carveout addresses only issued securities, and because options are granted and not issued, the Carveout excludes from the Waiver only shares, and not unexercised options. This interpretation preserves the Waiver's significance and the use of the terms "issue" and "grant" throughout Agreement 3.

Terrell points me to the world outside Agreement 3, specifically the Securities Act of 1933 and common law, for inspiration to conclude that issued securities include options.[69] He also implicitly suggests that the Carveout is ambiguous, arguing I should apply the *contra proferentem* canon.[70] For its part, the Company points me to several cases providing that options are not "issued" shares.[71] But Agreement 3 is unambiguous and provides an ample roadmap to a reasonable construction. It would be improper to stray from those directions.

In sum, I read the Waiver to be an express waiver, by which Terrell waived all rights to unexercised options granted to him in any agreement other than Agreement 3.

---

[69] Pl. Letter at 2 (first quoting 15 U.S.C. §77(b)(3); and then quoting and *Davidow v. Lrn. Corp.*, 2020 WL 898097, at *2, 4, 10 (Del. Ch. Feb. 25, 2020)).

[70] *See* PAB 6; *see also* Pl. Letter at 3–5.

[71] DOB 15–17 (first citing *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 478 (Del. Ch. Jan. 21, 2011); then citing *Corp. Prop. Assocs. 14 v. CHR Hldg. Corp.*, 2008 WL 963048, at *4 (Del. Ch. Apr. 10, 2008); and *Feldman v. Cutaia*, 2006 WL 920420, at *6 n.37 (Del. Ch. Apr. 5, 2006)).

### III.    CONCLUSION

Terrell's claims for a declaration that the unexercised options granted by Agreements 1 and 2 were not waived by the Grant Notice are DISMISSED.  The parties shall submit a stipulated proposed final order.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc:  All Counsel of Record, via *File & ServeXpress*